UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re

    SAMUEL STEINBERG
    a/k/a SAM STEINBERG,

                       Debtor.

Chapter 7

Case No. 14-10845-MG

----------------------------------------------------------------X

DAVID JAROSLAWICZ, DAVID WALKER,
DAVID JAROSLAWICZ, NEIL HERSKOWITZ,
PHIL LIFSCHITZ, and ABRAHAM ELIAS,

                       Plaintiffs,

      -against-

SAMUEL STEINBERG a/k/a SAM STEINBERG,

                       Defendant.

Adv. Proc. No. 14-02426

----------------------------------------------------------------X

## **PLAINTIFFS' PRE-TRIAL MEMORANDUM OF LAW**

**REISMAN PEIREZ REISMAN & CAPOBIANCO LLP**
1305 Franklin Avenue
PO Box 119
Garden City, New York 11530
Telephone:  (516) 746-7799
Facsimile:  (516) 742-4946
jreisman@reismanpeirez.com
*Attorneys for Plaintiffs David Jaroslawicz,*
*David Walker, Howard Freund, Neil Herskowitz,*
*Phil Lifschitz and Abraham Elias*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................1

PLAINTIFFS' CLAIMS ...................................................................................................3

      A.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(3).................................3

          1.    Elements of a 11 U.S.C. § 727(a)(3) Claim..................................4

          2.    Summary of Facts Relied Upon to Establish the Elements of
               Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(3)....................6

          3.    Evidentiary Issues Anticipated to Arise During Trial .................7

      B.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(2)(A) .........................11

          1.    Elements of a 11 U.S.C. § 523(a)(2)(A) Claim .........................11

          2.    Summary of Facts Relied Upon to Establish Each Element of
               Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(2)(A) ..........................13

          3.    Evidentiary Issues Anticipated to Arise During Trial...............19

      C.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(4)...............................24

          1.    The Elements of a Claim Pursuant to 11 U.S.C. § 523(a)(4)....................24

          2.    Summary of Facts Relied Upon to Establish Each Element of
                Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(4)..................25

          3.    Evidentiary Issues Anticipated at Trial.....................................27

      D.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(6)...............................27

          1.    Statement of the Elements of a 11 U.S.C. § 523(a)(6) .............28

          2.    Summary of Facts Relied Upon to Establish Each Element of
                Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(6)..................29

          3.    Evidentiary Issues Anticipated at Trial.....................................29

E.  Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(2)(A) ........................................29

  1.  Statement of the Elements of a 11 U.S.C. § 727(a)(2) Claim...................29

  2.  Summary of Facts Relied Upon to Establish Each Element of
      Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(2)................................30

  3.  Evidentiary Issues Anticipated at Trial....................................................31

F.  Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(4)(A) ........................................31

  1.  Statement of the Elements of a 11 U.S.C. § 727(a)(4)(A) Claim .............32

  2.  Summary of Facts Relied Upon to Establish Each Element of
      Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(4)(A) ..........................32

  3.  Evidentiary Issues Anticipated at Trial....................................................32

DEFENDANT'S COUNTERCLAIM ........................................................................33

  1.  Statement of the Elements to a Defense to a
      Claim for Indemnification.........................................................................33

  2.  Summary of Facts Relied upon to Establish a
      Defense to Defendant's Claim for Indemnification ..................................34

  3.  Evidentiary Issues Anticipated at Trial....................................................35

CONCLUSION.........................................................................................................35

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

### *Federal*

*Agai v. Antoniou (In re Antoniou)*,
   515 B.R. 9 (Bankr. E.D.N.Y. 2014) ........................................................... 32-33

*Amusement Indus. v. Stern*,
   786 F. Supp. 2d 758, 772–73 (S.D.N.Y. 2011),
   *adopted by* 07 Civ. 11586 (LAK),
   2011 U.S. Dist. LEXIS 25154 (S.D.N.Y., Mar. 11, 2011) ...............................23

*Breslin Realty Dev. Corp. v. Schackner (In re Schackner)*,
   Chapter 7, Case No.: 8-08-73742-478,
   Adv. Pro. No.: 8-09-08096-478,
   2011 Bankr. LEXIS 1235 (Bankr. E.D.N.Y. Apr. 7, 2011)............................8, 9

*Bronfman v. O'Hara (In re O'Hara)*,
   Chapter 7, Case No.: 08-12108, Adv. No.: 09-90055,
   2011 Bankr. LEXIS 1420 (Bankr. N.D.N.Y. Apr. 18, 2011) .............................5

*Bundy Am. Corp. v. Blankfort (In re Blankfort)*,
   217 B.R. 138 (Bankr. S.D.N.Y. 1998).............................................................28

*Cartiera v. Botticello (In re Botticello)*,
   2012 Bankr. LEXIS 4674 (Bankr. D. Conn. Sept. 26, 2012) ...............12, 13, 19

*Control Module, Inc. v. Dybowski (In re Dybowski)*,
   CHAPTER 7, CASE NO. 07-21152, ADV. PRO. NOS. 07-02051,
   RE: ADV. ECF NOS. 142, 163,
   2012 Bankr. LEXIS 2423 (Bankr. D. Conn. May 29, 2012) ...........................24

*Daly v. Braizblot (In re Braizblot)*,
   194 B.R. 14 (Bankr. E.D.N.Y. 1996)...............................................................23

*Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*,
   517 B.R. 53 (Bankr. N.D.N.Y. 2014) .........................................................22, 31

*Giminiani v. Cesar*,
   536 F. App'x 85 (2d Cir. 2013) .....................................................................113

*HSBC Bank USA v. Handel (In re Handel)*,
   266 B.R. 585, 2001 Bankr. LEXIS 12108 (Bankr. S.D.N.Y. 2001)............30, 32

**Page**

*Jacobowitz v. Cadle Co. (In re Jacobowitz),*
    309 B.R. 429 (S.D.N.Y. 2004)..................................................................8, 10

*Krohn v. Cromer (In re Cromer),*
    214 B.R. 86 (Bankr. E.D.N.Y. 1997)........................................................ 9-10

*Krohn v. Frommann,*
    153 B.R. 113 (Bankr. E.D.N.Y. 1993).......................................................4, 5

*Maciolek v. Firer (In re Firer),*
    317 B.R. 457 (Bankr. D. Conn. 2004) ..........................................................24

*Marina Dist. Dev. Co. LLC v. Chong Park (In re Chong Park),*
    492 B.R. 668 (Bankr. S.D.N.Y. 2013) ............................................ 11-12, 12

*Minsky v. Silverstein,*
    151 B.R. 657 (Bankr. E.D.N.Y. 1993)..........................................................30

*Navistar Fin. Corp. v. Stelluti (In re Stelluti),*
    94 F.3d 84 (2d Cir. 1996) ..............................................................................28

*Ochs v. Nemes (In re Nemes),*
    323 B.R. 316 (Bankr. E.D.N.Y. 2005)...........................................................9

*Pereira v. Gardner (In re Gardner),*
    384 B.R. 654 (Bankr. S.D.N.Y. 2008) (Glenn, J.)...................................... 4-5

*Signature Bank v. Banayan (In re Banayan),*
    468 B.R. 542 (Bankr. N.D.N.Y. 2012) ..........................................................22

*Strauss v. Strauss (In re Strauss),*
    2006 Bankr. LEXIS 2219 (Bankr. S.D.N.Y. July 21, 2006) ...........................28

*Stutey v. Mitchell (In re Mitchell),*
    CASE NO. 08-30245 (LMW), CHAPTER 7, ADV. PRO. NO. 08-3136,
    ECF NO. 1, 2012 Bankr. LEXIS (Bankr. D. Conn. Jan. 4, 2012).....................11

*Thaler v. Erdheim (In re Erdheim),*
    197 B.R. 23 (Bankr. E.D.N.Y. 1996)..............................................................5

*Van Deventer v. CS SCF Mgt. Ltd.,*
    47 A.D.3d 503 (1st Dep't 2008) ....................................................................35

**Page**

*Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),*
    368 B.R. 120 (Bankr. E.D.N.Y. 2007)............................................................................28

**_State_**

*Hooper Associates, Ltd. v. AGS Computers, Inc.,*
    74 N.Y.2d 487, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989)..............................................34

**Statutes**

11 U.S.C. § 523(a)(2)............................................................................................*passem*

11 U.S.C. § 523(a)(4)............................................................................................*passem*

11 U.S.C. § 523(a)(6)............................................................................................*passem*

11 U.S.C. § 727(a)(2)............................................................................................*passem*

11 U.S.C. § 727(a)(4)(A)......................................................................................*passem*

11 U.S.C. § 727(a)(4)(B)......................................................................................*passem*

Plaintiffs David Jaroslawicz, David Walker, Howard Freund, Neil Herskowitz, Phil Lifschitz and Abraham Elias (collectively, "Plaintiffs") hereby submit this pre-trial memorandum of law pursuant to the Court's Order dated July 23, 2015.  Dkt. No. 42, p. 2.

## PRELIMINARY STATEMENT

This is an adversary proceeding brought by Plaintiffs to object to the discharge of Defendant Samuel Steinberg and to the dischargeability of debts which he owes to Plaintiffs on the grounds that, *inter alia*, Defendant defrauded Plaintiffs and embezzled their money which they had entrusted to him to invest in or which they loaned to him in connection with a real estate venture in Romania (the "Romanian Real Estate Venture").  In this regard, from 2005 through 2013, Defendant conducted a fraudulent scheme by which he induced Plaintiffs to provide him with approximately $16,754,617.00 to purchase certain lands located in Romania (the "Romanian Properties") and thereafter squandered Plaintiffs' investment and loans, including by embezzling some of their funds.  Defendant implemented his fraudulent scheme in two incremental stages.

First, prior to April 2007, Defendant continuously misrepresented to Plaintiffs that he would be solely investing his own money and that of his family in Romanian Properties. Plaintiffs reasonably relied on these misrepresentations by Defendant when deciding to contribute to the Romanian Real Estate Venture.  However, Defendant in fact never had any intention of investing either his own money or his family's money in the Romanian Real Estate Venture and instead planned to raise his share by placing mortgages upon the Romanian Properties, thereby putting Plaintiffs' investment at grave risk.  If Plaintiffs had known that Defendant was going to encumber the Romanian Properties with mortgages, they never would have provided Defendant with funds to invest in the Romanian Real Estate Venture.

1

Second, after the spring of 2007, when Plaintiff David Jaroslawicz ("Jaroslawicz:") learned that Defendant intended to place mortgages on the Romanian Properties in order to cover his share for the Romanian Real Estate Venture, Defendant continuously misrepresented his financial condition and that he would be solely responsible for making interest payments for these mortgages until the subject properties were sold.  Again, when he made these representations, Defendant had no intention of making interest payments upon the mortgages and knew that he did not have the financial resources to continue covering the interest payments.  Rather, Defendant, *inter alia*, embezzled Plaintiffs' monies in order use it to pay the interest on the mortgages.  Plaintiffs reasonably relied on Defendant's false statements in agreeing to the mortgages and giving Defendant further funds to invest into the Romanian Real Estate Venture.

Ultimately, Defendant's web of lies and deceit caused the mortgages to be foreclosed upon by the banks after Defendant failed to make the required interest payments.  As a result, Plaintiffs lost their entire investment of over sixteen million dollars.

Moreover, Defendant has never provided Plaintiffs with a proper accounting with respect to the monies Plaintiffs entrusted to him to invest in the Romanian Properties and has admitted that he has failed to preserve critical documents in connection with the Romanian Real Estate Venture.  In this way, he has been able to conceal much of his mishandling and embezzlement of the Plaintiffs' investment funds.

Finally, after the underlying bankruptcy case was commenced, Defendant has fraudulently transferred and diverted his personal assets to his wife, Channa Steinberg ("Channa"); specifically, based on emails involving Defendant's accountants and the fact that Defendant has yet to produce his 2014 tax returns, it can be inferred that Defendant has

transferred a carry-forward loss deduction to Channa in connection with Defendant's alleged losses from the Romanian Real Estate Venture. Defendant has also made false oaths or accounts and presented or used false claims during the pendency of his bankruptcy case, including failing to disclose that his apartment in Romania and failing to reveal the consideration received from Channa under their separation agreement and "Get," which is a Jewish divorce document.

## PLAINTIFFS' CLAIMS

Plaintiffs bring this adversary proceeding against Defendant seeking, *inter alia*, an order declaring that the debts owed by Defendant to Plaintiffs – amounting to at least $16,754,617.00, plus punitive damages – be deemed non-dischargeable. To that end, Plaintiffs assert the following six causes of action: (1) fraudulent misrepresentations, fraudulent pretenses and actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A); (2) embezzlement and larceny pursuant to 11 U.S.C. § 523(a)(4); (3) willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6); (4) fraudulent transfer and diversion of personal assets within one year of the filing date pursuant to 11 U.S.C. § 727(a)(2); (5) making false oaths or accounts and presenting false claims pursuant to 11 U.S.C. § 727(a)(4)(A) and (B); and (6) concealment, destruction, mutilation, falsification and/or failure to keep or preserve records pursuant to 11 U.S.C. § 727(a)(3).

Per the Court's instructions in its July 23, 2015 Order, Plaintiffs will now proceed to provide "a statement of the elements of each claim or defense involving such party, together with a summary of the facts relied upon to establish each element, and addressing any evidentiary issues anticipated to arise during trial[.]" Dkt. No. 42, p. 2.

## A.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(3)

At the outset, based on Defendant's very own admissions, this Court should deny the dischargeability of the debts owed by Defendant to Plaintiffs pursuant to 11 U.S.C.

§ 727(a)(3).  Indeed, it is undisputed that Defendant has failed to preserve the records pertaining

to the Romanian Real Estate Venture.  As a result, Defendant has interfered with the ability of

Plaintiffs to investigate and determine the extent of Defendant's fraud and his embezzlement of

their investment funds.  Critically, as discussed herein, Defendant's failure alone is enough to

prevent the dischargeability of the debts which he owes to Plaintiffs.

### 1.      Elements of a 11 U.S.C. § 727(a)(3) Claim

According to 11 U.S.C. § 727(a)(3), a bankruptcy court should not discharge a

debt where "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or

preserve any recorded information, including books, documents, records, and papers, from which

the debtor's financial condition or business transactions might be ascertained, unless such act or

failure to act was justified under all of the circumstances of the case."  Importantly, "[t]he

fundamental policy underlying § 727(a)(3) is to insure that the trustee and the creditors receive

sufficient information to effectively enable them 'to trace the debtor's financial history, to

ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions.'"

*Krohn v. Frommann*, 153 B.R. 113, (Bankr. E.D.N.Y. 1993) (quoting *In re Goldstein*, 123

Bankr. 514, 522 (Bankr. E.D. Pa. 1991)) (collecting cases).

Denial of discharge under § 727(a)(3) rests on proof of the following:

> 1. failure by the debtor to keep or preserve any recorded
> information, including books, documents, records and papers, *or*
> 2. an act of destruction, mutilation, falsification or concealment of
> any recorded information including books, documents, records and
> papers by the debtor or someone acting for the debtor
> 3. *and* that by failing to keep such books or records, or by
> destroying or concealing such records, it is impossible to ascertain
> the financial condition and material business transactions of the
> debtor.

4

*Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 665 (Bankr. S.D.N.Y. 2008) (Glenn, J.)

(emphasis in original). "A creditor objecting to a debtor's discharge under § 727(a)(3) has the

initial burden to establish [these] elements." *Bronfman v. O'Hara (In re O'Hara)*, Chapter 7,

Case No.: 08-12108, Adv. No.: 09-90055, 2011 Bankr. LEXIS 1420, at *25 (Bankr. N.D.N.Y.

Apr. 18, 2011). Notably, "intent to conceal one's financial condition is no longer a prerequisite

to support an objection to discharge pursuant to § 727(a)(3)." *Krohn*, 153 B.R. at 116.

Thus, "[w]hen a debtor is involved in several transactions of an extensive nature,

a substantially accurate and complete record of [his] affairs is a prerequisite to [his] discharge

unless there is a justification for the lack of records." *Id.* at 117 (citation and internal quotation

marks omitted). While "[t]he court has broad discretion in determining whether the records

produced by the debtor are sufficient[,]" courts nonetheless consider several factors, including

> whether a debtor was engaged in business and, if so, the
> complexity and volume of the business; the amount of the debtor's
> obligations; whether the debtor's failure to keep or preserve books
> and records was due to the debtor's fault; the debtor's education,
> business experience and sophistication; the customary business
> practices for record keeping in the debtor's type of business; the
> degree of accuracy disclosed by the debtor's existing books and
> records; the extent of any egregious conduct on the debtor's part;
> and the debtor's courtroom demeanor.

*Id.* (citations omitted). Moreover, in reviewing an objection to a discharge based on the debtor's

failure to keep books or records from which the debtor's financial condition may be ascertained,

the court must be mindful of the debtor's obligation in a bankruptcy case to reveal, rather than

conceal, a complete financial picture. *Thaler v. Erdheim (In re Erdheim)*, 197 B.R. 23, 29

(Bankr. E.D.N.Y. 1996) (*citing In re Delancey*, 58 B.R. 762, 767–68 (Bankr. S.D.N.Y. 1986)).

    2.    **Summary of Facts Relied upon to Establish the Elements of Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(3)**

Defendant has unequivocally admitted at his deposition that he has failed to preserve the records pertaining to the Romanian Real Estate Venture.  Specifically, Defendant testified that he turned over all of the original "accounting files" to the Romanian Judicial Administrator in 2013, when he filed for insolvency on behalf of the three Romanian limited liability companies that he and Jaroslawicz had formed to conduct the business of the Romanian Real Estate Venture.  Def. Dep., pp. 69:11–70:8.  These accounting files detailed all of the expenses related to the Romanian Real Estate Ventures and are still  "presently located at the Judicial Administrator's office" in Romania.  Def. Dep., pp. 69:11–70:8.  When asked if he retained any copies of this vital documentation, Defendant simply answered "No, I did not." Def. Dep., pp. 70:20–23.

By providing the Romanian Judicial Administrator with the original documents in the accounting files and not making any copies, Defendant has obstructed Plaintiffs' ability to fully assess his financial conduction and has made it nearly impossible for Plaintiffs to determine the extent of Defendant's fraudulent conduct and embezzlement.  For example, in a self-serving spreadsheet, which Defendant only prepared in connection with the litigation between the parties, Defendant claims to have incurred €3,764,202 in "Additional Land Costs" with respect to the Romanian Real Estate Venture.  *See* PX-17 (1446).  However, because he purportedly turned over all original documents concerning the Romanian Real Estate Venture to the Judicial Administrator and retained no copies, he allegedly has no documentation for any of these costs. In this way, Defendant's failure to even maintain working copies of the accounting files that he gave to the Judicial Administrator has allowed Defendant to continue hiding his true financial condition and to repeatedly hinder Plaintiffs and the Court from properly analyzing the

transactions surrounding the Romanian Real Estate Venture, including with respect to the

€3,764,202 for alleged "Additional Land Costs" mentioned above.  Emails between the

Romanian Judicial Administrator, Liliana Andreea Ciurea, and Defendant further suggest that

the two were withholding crucial information from Jaroslawicz, as the Judicial Administrator

expressly told Defendant that she did not want Jaroslawicz learning about the emails between her

and Defendant.  *See* PX-13 (EE2193).

The lack of documentation is particularly troubling in light of the many suspicious

claims that Defendant has made with respect to Plaintiffs' investment funds.  For instance, in

2010, Defendant claimed, for the first time, that a man named Adrian Vladarean ("Vladarean")

stole €345,330 of Plaintiffs' investment funds in 2006.  Despite the alleged "theft" of this

enormous sum of money, Defendant cannot point to any documentation demonstrating that these

funds were actually provided to Vladarean.

As such, by failing to preserve any of the documentation concerning the

Romanian Real Estate Venture, Defendant has been able to conceal his fraud and embezzlement

of Plaintiffs' investment funds.  Defendant further compounded this failure by never providing

Plaintiffs with a meaningful accounting for the investment funds to which Plaintiffs entrusted

him, in spite of repeated requests by Jaroslawicz.  Therefore, a denial of discharge is clearly

warranted pursuant to 11 U.S.C. § 727(a)(3).

### 3.    Evidentiary Issues Anticipated to Arise During Trial

Defendant has previously tried to excuse his failure to preserve the records for the

Romanian Real Estate Venture because (1) the cost of making copies was too expensive and

(2) Plaintiffs know of where the documentation is located and can, thus, retrieve the records

themselves.  However, case law makes clear that such excuses are woefully insufficient to

7

bypass 11 U.S.C. § 727(a)(3).  As a consequence, any evidence that Defendant may proffer to

support either excuse should be deemed irrelevant and immaterial to the question of whether a

denial of discharge is appropriate under 11 U.S.C. § 727(a)(3).

Particularly instructive here is the court's decision in *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429 (S.D.N.Y. 2004).  In that case, the court rejected a debtor's claim

that he was relieved of responsibility to provide records by telling a creditor or trustee where the

documents were located.  *Id.* at 438.  Specifically, the *Jacobowitz* court held as follows:

> The fact that a debtor directs its creditors to where they might
> obtain the records they seek does not relieve the debtor of his
> responsibility to provide adequate records.  The debtor is under an
> affirmative obligation to provide records that paint a true and
> accurate picture of the financial condition of the debtor at the time
> of filing.  Where the debtor is under a duty to keep or preserve
> records, a party objecting to discharge need show only that it
> cannot ascertain the debtor's financial condition and recent
> business transactions from the records provided.  It is not
> necessary to show that there is no conceivable way to ascertain the
> financial condition of the debtor.  If this were the case, before
> making an objection under § 727(a)(3) every creditor would be
> required to conduct a costly investigation whenever the debtor
> failed to produce adequate records.  This result would be
> inconsistent with the debtor's duty to treat his creditors in
> bankruptcy fairly.

*Id.* at 438 (citations omitted).  Likewise, in the instant action, Defendant's suggestion that

Plaintiffs should be responsible for tracking down the subject records in Romania for which

Defendant was responsible is both absurd and unfair to Plaintiffs.  Moreover, although

Jaroslawicz has constantly requested that Defendant give him the address where the records are

being kept and to turn them over to a lawyer, Defendant has refused to comply.

Also instructive is *Breslin Realty Dev. Corp. v. Schackner (In re Schackner)*,

Chapter 7, Case No.: 8-08-73742-478, Adv. Pro. No.: 8-09-08096-478, 2011 Bankr. LEXIS

1235, at *16–18 (Bankr. E.D.N.Y. Apr. 7, 2011).  The *Schackner* court explained that a debtor –

and not his creditors – is personally obligated to produce relevant records and, hence, he cannot

point to third parties:

> [I]t was the Defendant's responsibility to provide his creditors and
> the Trustee with the documents which could reveal the
> Defendant's financial condition, including documents that may be
> held by third parties on his behalf such as those that may be held
> by his accountant or obtainable from the bank, and the Defendant
> has failed to do so.  Accordingly, the Court finds that Defendant
> has failed to keep and preserve books, documents and records
> relating to his financial condition or business transactions.  The
> Defendant's failure to keep or preserve such books, documents and
> records adversely affects the ability of the Trustee and creditors to
> ascertain the Debtor's financial condition, assets and business
> transactions.

*Id.* at *18; *see also Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 330 (Bankr. E.D.N.Y. 2005)

("The Debtor, not the Trustee, has an affirmative obligation to provide 'complete disclosure' of

his financial affairs.  The Trustee and creditors are not required to ferret out the required

documents.") (citations and internal quotation marks omitted) (collecting cases).  In similar

fashion, Defendant's failure to retain the records that he provided to the Judicial Administrator in

Romania has infringed upon Plaintiffs' ability to obtain a clear picture of Defendant's financial

condition and business transactions with respect to their over sixteen million dollar investment

into the Romanian Real Estate Venture.

   As to Defendant's claims that he did not have enough money to make copies of

the supporting documentation related to the Romanian Real Estate Venture (*see, e.g.*, Def. Dep.,

pp. 72:24–73:5), this argument is similarly inadequate.  Simply put, under existing case law,

Defendant cannot claim lack of funds as an excuse for failing to keep proper records.  Indeed,

"[a] deteriorating financial condition does not alleviate a debtor from his duty under § 727(a)(3)

to keep books and records. In fact, it is during this time that the need for accurate books and

records *may be at its greatest*."  *Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 100 (Bankr.

E.D.N.Y. 1997) (citation omitted) (emphasis supplied).  In fact, "[e]ven if the debtor's income

was at or below the poverty level and his family relies in part upon charity, the debtor is not

relieved of his responsibility to respond to reasonable requests from his creditors for records."

*In re Jacobowitz*, 309 B.R. at 439 (citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.

1992) ("Certainly insolvency cannot be used as an excuse to avoid the obligation to provide

records to illuminate that condition.")).  In any event, Defendant's claim is frivolous in light of

the fact that he has sufficient funds to maintain an apartment in Romania for the last several

years and travel back and forth between New York and Romania.

   Further, outside of the alleged costs he would have incurred to make copies,

Defendant has no justification for failing to preserve adequate records after beginning insolvency

proceedings in Romania.  The Romanian Real Estate Venture was not a small business, but

rather an enormous enterprise in which Plaintiffs entrusted Defendant with more than sixteen

million dollars.  In addition, Defendant disposed of the records in 2013, just one year before the

filing date in the underlying bankruptcy case, when litigation between the parties seemed likely.

   Finally, Defendant was an extremely savvy person who was involved in

sophisticated real estate transactions; consequently, his claims that he has not preserved any

supporting documentation in connection with the Romanian Real Estate Venture are simply not

credible.   This is particularly true in light of the fact that he admits to selectively retaining

copies of certain documents, such as the land contracts for the Romanian Properties, but yet

failed to maintain bookkeeping reports which might shed light on his mishandling of the

investment funds from Plaintiffs.  Def. Dep., pp. 335:7–336:18.

   Since Defendant had a legal duty to maintain adequate records, and blatantly

failed to do so, Defendant's discharge must be denied pursuant to 11 U.S.C. § 727(a)(3).

**B.**      **Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(2)(A)**

Despite the above-described failure by Defendant to preserve critical records or to provide a proper accounting, Plaintiffs have still uncovered sufficient evidence to demonstrate that Defendant defrauded Plaintiffs out of more than sixteen million dollars in connection with the Romanian Real Estate Venture.  Indeed, as will be explained herein, Defendant knowingly made a series of false statements concerning his financial condition, his intent to contribute to the Romanian Real Estate Venture without encumbering the Romanian Properties with mortgages and his intent to make all interest payments on the mortgages thereafter acquired.  Plaintiffs reasonably relied on Defendant's misrepresentations to their detriment, resulting in them losing their entire sixteen million investment due to Defendant's fraudulent conduct.

**1.**      **Elements of a 11 U.S.C. § 523(a)(2)(A) Claim**

Subsection (a)(2)(A) of Bankruptcy Code § 523 provides that an individual debtor may not be discharged from any debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> (A)      false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

In order for § 523(a)(2)(A)'s exception to discharge to apply, the "debtor's conduct must involve moral turpitude or intentional wrong[.]"  *Stutey v. Mitchell (In re Mitchell)*, CASE NO. 08-30245 (LMW), CHAPTER 7, ADV. PRO. NO. 08-3136, ECF NO. 1, 2012 Bankr. LEXIS, at *39 (Bankr. D. Conn. Jan. 4, 2012) (citation omitted).  However, "[d]eterminations as to what constitutes 'false pretenses,' 'a false representation,' and 'actual fraud' rest on common law."  *Marina Dist. Dev. Co. LLC v. Chong Park (In re Chong Park)*, 492

B.R. 668, 682 (Bankr. S.D.N.Y. 2013); *see also Cartiera v. Botticello (In re Botticello)*, 2012

Bankr. LEXIS 4674, at *15–16 (Bankr. D. Conn. Sept. 26, 2012) ("These terms of art were used

by Congress to incorporate the general common-law of such torts; i.e. the 'dominant consensus'

of jurisdictions, rather than the specific law of any given State.").

"[U]nder the false representation provision of subsection A, the creditor-plaintiff

must demonstrate that: '(1) the debtor made the representations knowing they were false; (2) the

debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the

creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss

or damage as a proximate consequence of the representation having been made." *In re Chong

Park,* 492 B.R. at 682–83 (quoting *Adamar of New Jersey, Inc. v. August (In re August)*, 448

B.R. 331, 349 (Bankr. E.D. Pa. 2011)); *see also In re Botticello*, 2012 Bankr. LEXIS 4674, at

*16.  "In addition, [both] a party who conceals material information with the intention of

preventing another from acquiring it . . . [a]nd a party to a business transaction who fails to

disclose to another party a fact that he knows may justifiably induce that party to refrain from

entering into a business transaction is subject to the same liability as one who makes a 'false

representation.'" *In re Botticello*, 2012 Bankr. LEXIS 4674, at *16–17.

As to "false pretense," this provision requires there be "a misrepresentation

implied from purposeful conduct intended to create a false impression." *Id.* at *17 (citations and

internal quotation marks, brackets and ellipses omitted).  In this regard, "[t]he implication arises

when a debtor, with the intention to mislead a creditor, engages in a series of events, activities or

communications which, when considered collectively, create a false and misleading set of

circumstances, or understanding of a transaction, by which the creditor is wrongfully induced by

the debtor to transfer property or extend credit." *Id.* (citations and internal quotation marks, brackets and ellipses omitted).

Finally, "'[a]ctual fraud' is any intentional deceit, artifice, trick, or design used to circumvent and cheat another, i.e. something said, done, or omitted with the design of perpetrating what is known by the debtor to be a deception. " *Id.* at *17–18. (citations omitted).

Whether pursuing a theory of false representation, false pretense or actual fraud, the creditor carries the burden, as "the party seeking nondischargeability[,] [of] establish[ing] each of the elements of §523(a)(2)(A) by a preponderance of the evidence." *Id.* at *18; *see also Giminiani v. Cesar*, 536 F. App'x 85, 87–88 (2d Cir. 2013). "[O]nce a creditor establishes a prima facie case of fraud, the burden of coming forward with some proof or explanation of the alleged fraud shifts to the debtor." *In re Botticello*, 2012 Bankr. LEXIS 4674, at *18 (citation omitted).

### 2. Summary of Facts Relied upon to Establish Each Element of Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(2)(A)

As previously stated, Defendant's fraudulent scheme involved two different phases. Defendant commenced the first stage in late 2005 and early 2006 when he approached Jaroslawicz about investing money in the Romanian Real Estate Venture. Jaroslawicz and Defendant were long-time and close family friends; they had previously engaged in business dealings together and their families visited each other for weekend lunches and spent Jewish holidays with one another. Def. Dep, pp. 12:11–14:21; 34:18–36:11. In fact, Defendant led the prayers at the bar mitzvah for Jaroslawicz's son, which is a very important honor in the Jewish religion. As a result, Jaroslawicz greatly trusted Defendant.

After Defendant approached Jaroslawicz, pursuant to a February 2006 oral agreement, in order to conduct their business, Defendant and Jaroslawicz agreed to form an

American limited liability company called Kluj Properties, LLC, in which they would be fifty-fifty partners.  Based on Defendant's claims that only Romanian companies could own property in Romania, they formed three ROMUSA limited liability companies – ROMUSA Real Estate, SRL; ROMUSA Investments, SRL; and ROMUSA Holdings, SRL (the "ROMUSA LLCs") – in which they would also be fifty-fifty partners.  All the ROMUSA LLCs were to be subsidiaries of Kluj Properties, LLC.  Kluj Properties, LLC was located at Defendant's office address at 675 Avenue of the Americas, New York, New York 10010.  Thus, as fifty-fifty partners in the Romanian Real Estate Venture, Defendant and Jaroslawicz would share equally in both the profits and losses.

Defendant and Jaroslawicz further agreed that Defendant would serve as the operating partner on the ground for the Romanian Real Estate Venture.  As such, Defendant was entrusted with all of the investment funds and was expected to act as a fiduciary, including, *inter alia*, providing Jaroslawicz with periodic accountings, behaving honestly and conducting affairs related to the Romanian Real Estate Venture responsibly.

In addition, as part of the February 2006 oral agreement, Defendant and Jaroslawicz agreed to each invest the same amount of money to purchase the Romanian Properties, which were to remain free of any mortgages.  Defendant acknowledged this aspect of the February 2006 agreement in a purported accounting he prepared for Jaroslawicz in December 2006; specifically, Defendant recognized that he owed Jaroslawicz more than $200,000 for his equal share for the Romanian Real Estate Venture.  *See* PX-1, EE3094.  Of note, the December 2006 purported accounting was the last accounting that Jaroslawicz received from Defendant, despite numerous requests by Jaroslawicz.

However, in the period prior to the February 2006 agreement, Defendant had in fact repeatedly misled Jaroslawicz into believing that Defendant would only be using his own money and money from his wife's family for his share for the Romanian Real Estate Venture, despite having no intention to do so.  Defendant made these misrepresentations to Jaroslawicz knowing Jaroslawicz would repeat them to other investors, such as the other Plaintiffs.

For example, Defendant admitted in his deposition testimony that when he and Jaroslawicz first visited Romania in 2006, before they had made any investments, Defendant went to the bank armed with a bank statement for a business owned by his father-in-law, Israel Taub ("Taub"), and, in Jaroslawicz's presence, used it to demonstrate that he had access to tens of millions of dollars to back up his credit.  *See* Def.'s Dep., pp. 82: 7–83:17; 87:9–88:6.  Yet, Defendant also insisted throughout his deposition testimony that his family was never involved with the Romanian Real Estate Venture, thereby indicating that Defendant was creating a false pretense and misrepresenting his family's involvement when he used the bank statement.  *See* Def.'s Dep., pp. 256:15–257:8.  Indeed, by presenting documents concerning the Taub family finances in full view of Jaroslawicz, Defendant created a misrepresentation that was implied from purposeful conduct intended to create the false impression that Defendant's source of investment funds would be the large Taub family fortune.  Defendant's bad faith and intent are further demonstrated by the deposition testimony of Taub and Channa, both of whom have claimed that Defendant had no authority to present any financial statements related to the Taub family or its businesses.  *See* Channa Dep., pp. 90:15–93:10; Taub Dep., pp. 65:18–66:18.

Additionally, Defendant told Jaroslawicz that he would be able to cover his share for the Romanian Real Estate Venture using the proceeds from the sale of his apartments, again knowing his statement was false.  In fact, while the sale of his apartments generated Defendant

15

approximately $6 million dollars in proceeds, Defendant has been unable to account for around $2 million of these proceeds, even though this money was supposed to be put toward his part of the investment in the Romanian Real Estate Venture.  Defendant continued to make similar misrepresentations after Jaroslawicz and Defendant entered into the February 2006 agreement.

In justifiable reliance upon these misrepresentations and false pretenses, Jaroslawicz, together with Plaintiffs Howard Freund ("Freund"), Neil Herskowitz and Phil Lifschitz, invested a total of $7,681,386 in the Romanian Real Estate Venture between February 16, 2006 and March 27, 2007.  In addition, Plaintiffs David Walker and Abraham Elias personally loaned Defendant money to invest in the Romanian Real Estate Venture, but did not invest.  Conversely, during this period, despite Defendant's continuous representations, Defendant personally contributed only $2,043,500 to the Romanian Real Estate Venture.

Of note, when Jaroslawicz confronted Defendant with the fact that Defendant and his family had not invested any money into the purchase of a property in Brasov, Defendant brazenly responded "what point would you like to make?"  PX-46 (EE841).

Eventually, in or about April 2007, after committing Plaintiffs' investments to the purchase of several of the Romanian Properties, Defendant notified Jaroslawicz that he intended to place mortgages on the Romanian Properties in order to get a bank loan to fund his share for the Romanian Real Estate Venture, in direct contravention of the representations Defendant made prior to their February 2006 agreement.  At this point, Defendant implemented the second stage of his fraudulent scheme, in which he misrepresented to Jaroslawicz his financial condition and that he and his family would be solely responsible for making interest payments for these mortgages until the subject properties were sold.  When he made these representations,

Defendant knew he did not have the financial means to cover the interest payments for the mortgages and had no intention of either he or his family making such payments.

Moreover, Defendant told Jaroslawicz both orally and in writing that Jaroslawicz had to approve the mortgages because otherwise Defendant could not get a bank loan to cover the remaining cost for the purchase of the Romanian Properties, thus causing Plaintiffs to lose the money that Defendant had already committed to said purchases. Faced with losing Plaintiffs' substantial investments and in reasonable reliance upon Defendant's misrepresentations, Jaroslawicz had no choice but to sign an Apostille in April 2007 encumbering one of the Romanian Properties with a mortgage. *See* Jaroslawicz Dep., pp. 89:1-91:18.

Jaroslawicz was later misled and coerced into signing three other Apostilles in connection with the Romanian Properties (together with the April 2007 Apostille, the "Apostilles") in order to avoid losing Plaintiffs' multi-million dollar investment. These Apostilles were signed on November 16, 2007, May 8, 2008 and May 24, 2011 respectively. As with the April 2007 Apostille, when Jaroslawicz signed these later Apostilles, he reasonably relied on Defendant's misrepresentations concerning his financial condition and that he and his family would be solely responsible for making the interest payments for the mortgages. Thus, reasonably relying on Defendant's repeated misrepresentations concerning the interest payments on the mortgage, Plaintiffs invested a total of $11,233,231 between April 2007 and 2013.

However, while Defendant continued to represent to Jaroslawicz that he would be solely responsible for making all of the interest payments for the mortgages, he knew that his statements were fraudulent when made. *See, e.g.*, PX-4 (EE1201–03); PX-5 (EE1162); PX-6 (EE1193); PX-7 (EE1055); PX-8 (EE1059). In fact, Defendant has admitted to using investor funds to make interest payments upon the mortgages almost immediately after the first

17

Romanian Property was encumbered with a mortgage in early 2007.   *See* Def. Dep., pp. 146:20–147:15.   Moreover, when a €298,000 deposit for an apartment located in Silver Mountain was returned to Defendant in August 2009, Defendant misappropriated the entire amount to make interest payments upon the mortgages when Jaroslawicz was clearly entitled to be refunded at least €149,000.   *See* Def. Dep., pp. 152:9–155:3.

Defendant also refused to keep separate those Romanian Properties that were not encumbered by mortgages from those that were encumbered by mortgages, thereby creating further unnecessary risk for Plaintiffs.

Eventually, the mortgages were foreclosed upon when Defendant failed to make the required interest payments, causing Plaintiffs to lose more than sixteen million dollars.

In sum, Defendant concocted a scheme by which he fraudulently induced Plaintiffs to provide the vast majority of the investment funds for the Romanian Real Estate Venture while secretly having no intention to either contribute his own share or to make interest payments unless the Romanian Properties seemed likely to reap enormous profits.   Thus, while Defendant would reap an enormous windfall if the Romanian Properties earned major profits, Plaintiffs would be unknowingly forced to bear all of the risk.   Such risks were not limited to the fluctuations of the Romanian real estate market, but also encompassed the risk that Defendant would simply stop making interest payments based upon his own individual interests.

As such, the above facts establish that Defendant obtained investment funds from Plaintiffs by means of false representation, false pretense and actual fraud.   Indeed, these facts establish that (1) Defendant knowingly made false statements and engaged in conduct designed to mislead Plaintiffs and induce them into entrusting Defendant with more than sixteen million dollars; (2) Plaintiffs justifiably relied on Defendant's misrepresentations and misleading

conduct; and (3) as a result of this reliance on Defendant's fraudulent statements and false

pretenses, Plaintiffs' lost their entire sixteen million dollar investment.

Since Plaintiffs have "establishe[d] a prima facie case of fraud, the burden of

coming forward with some proof or explanation of the alleged fraud shifts to the debtor." *In re

Botticello*, 2012 Bankr. LEXIS 4674, at *18.  Here, Defendant has not come forward with

adequate proof or explanation.  Accordingly, Defendant's debts to Plaintiffs must be held non-

dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### 3.      Evidentiary Issues Anticipated to Arise During Trial

In his Proposed Pretrial Order, Defendant argues that Plaintiffs have failed to

prove that the corporate form of the ROMUSA LLCs should be disregarded and that Plaintiffs'

claims are derivative claims by shareholders.  Dkt. No. 56, p. 7.  However, this argument is

simply a smokescreen designed to distract the Court from Defendant's fraudulent conduct.

Although Defendant's failure to retain records for the Romanian Real Estate

Venture or provide a proper accounting has hindered Plaintiffs ability to garner relevant

evidence, there is nonetheless adequate proof demonstrating Defendant's complete disregard for

the corporate form.  Indeed, Defendant conducted business for the Romanian Real Estate

Venture using his own personal bank accounts.  For example, he instructed Jaroslawicz to send

his investment monies and that of Plaintiffs by wire directly to Defendant's personal bank

account in Romania rather than the bank accounts of the ROMUSA LLCs, indicating that

Defendant comingled funds.  *See e.g.*, PX-122, Bank Records for Samuel Steinberg, US-01-US-

17.  He also admitted to using investment funds for an apartment lease over the course of one to

two years, which for reasons unknown put in one of the ROMUSA LLCs' names.  Def. Dep., pp.

169:10–18.  He even suggested that it would be "legitimate" if he used "other monies from the

company . . . for [his] expenses" in the event such commingling was discovered.  Def. Dep., pp. 169:15–18.  Of course, it remains impossible to verify the extent of the commingling because Defendant turned over all of the ROMUSA LLCs' records to the Romanian Judicial Administrator without retaining any copies.

Moreover, most of the Plaintiffs, with the exception of Jaroslawicz, were not even members of the ROMUSA LLCs or of Kluj Properties LLC.  As such, it is absurd for Defendant to suggest that the Plaintiffs should have brought a derivative lawsuit.  Moreover, Defendant's argument completely misunderstands Plaintiffs' claims.  Plaintiffs are not arguing that they were entitled to a return on their investment; rather, Plaintiffs' position is that they never would have entrusted over sixteen million dollars to Defendant to begin with if they had known (1) that Defendant did not intend to fund his share of the investment for the Romanian Real Estate Venture without encumbering the Romanian Properties with mortgages and (2) once mortgages were placed upon the Romanian Properties, that Defendant was going to make all interest payments until the subject properties were sold.

In addition, Defendant will likely dispute that he ever represented that he intended to raise an equal share for the Romanian Real Estate Venture without mortgaging the Romanian Properties or that he represented that he was going to personally be responsible for paying all of the interest payments for the mortgages.  Defendant will also argue, despite this position, that he should be credited with the mortgage proceeds as his share for the Romanian Real Estate Venture.  In fact, in a spreadsheet prepared by Defendant demonstrating investment funds contributed by Plaintiffs and Defendant, Defendant refers to the €9,000,000 in mortgage proceeds as alleged "Sam Steinberg: Romanian Funding[.]"  *See* PX-11, 1494.  Additionally, at

20

his June 11, 2015 deposition, Defendant contended that the mortgage proceeds were his alleged

share for the Romanian Real Estate Venture.  *See* Def. Dep., pp. 130:12–132:10.

        Clearly, such contentions are nonsensical.  Why would Plaintiffs ever agree to

invest over sixteen million dollars of their own personal money into the Romanian Real Estate

Venture but yet permit Defendant to cover his share by obtaining bank loans through mortgages

on the Romanian Properties which were purchased with Plaintiffs' investment funds?  Further, if

the proceeds from the mortgages were supposed to, in fact, be Defendant's share for the

Romanian Real Estate Venture, why would Plaintiffs agree to have anyone but Defendant

personally be responsible to make the interest payments?  Defendant can offer no satisfactory

explanation to these questions.  If Defendant's allegations are to be believed, it would mean that

Plaintiffs inexplicably agreed to allow Defendant to jeopardize their sixteen million dollar

investment in order to grant Defendant an enormous windfall where he would get to reap in the

profits of the Romanian Real Estate Venture without actually providing his own funding and by

using Plaintiffs' partnership interest as leverage.   Simply put, Defendant's fanciful tale is

incredulous and lacks all credibility.

        Moreover, Defendant's very own emails to Jaroslawicz reveal repeated statements

by Defendant indicating that he was obligated to pay for the interest on the mortgages until the

Romanian Properties were sold.  *See, e.g.*, PX-4 (EE1201–03); PX-5 (EE1162); PX-6 (EE1193);

PX-7 (EE1055); PX-8 (EE1059).  These emails completely dispel any allegation by Defendant

that he never misrepresented to Jaroslawicz his intent to be responsible for the interest payments,

further undercutting Defendant's credibility.

        Plaintiffs have also furnished adequate evidence to demonstrate Defendant's

intent when he made his misrepresentations.  As explained above, Defendant mischaracterized

his financial condition and his access to the resources of his wife's family in order to misled

Plaintiffs into believing that he had the means to invest an equal share into the Romanian Real

Estate Venture and would not need to resort to leveraging the Romanian Properties and

Plaintiffs' money in order to get a bank loan to cover his part.  In this regard, Defendant admits

to presenting a Taub family bank statement in Jaroslawicz's presence which suggested that he

had access to tens of millions of dollars, while also conceding that the Taub family was never

involved with the Romanian Real Estate Venture. *See* Def.'s Dep., pp. 82: 7–83:17; 87:9–88:6;

256:15–257:8.  Likewise, immediately after taking out the mortgages on the Romanian

Properties, Defendant began to pay for some of the interest payments with Plaintiffs' investment

funds rather than with his own money. *See* Def. Dep., pp. 146:20–147:15.  This circumstantial

evidence is sufficient to prove Defendant's intent. *See Signature Bank v. Banayan (In re*

*Banayan)*, 468 B.R. 542, 576 (Bankr. N.D.N.Y. 2012) ("Because fraudulent intent is rarely

admitted by a debtor, courts uniformly recognize that it may be established by circumstantial

evidence or by inferences drawn from a course of conduct.").

Moreover, of note, "determinations concerning fraudulent intent are questions of

fact that depend largely upon an assessment of the credibility and demeanor of the debtor."

*Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 64 (Bankr. N.D.N.Y.

2014) (citation omitted).  Given the aforesaid unbelievable story proffered by Defendant,

Defendant's complete lack of credibility strongly indicates his fraudulent intent.

Plaintiffs' reliance on Defendant's false statements and pretenses was also

justified, especially in light of Jaroslawicz and Defendant's close relationship.  Indeed, "[a]

number of courts have found that reliance on representations made by a personal friend with

whom the [creditor] had a long term relationship is 'reasonable'" and "that [ ] [p]laintiffs [have]

'justifiably' relied on [ ] false statements [when said statements are] made by their good and

close friends." *Daly v. Braizblot (In re Braizblot)*, 194 B.R. 14, 20 (Bankr. E.D.N.Y. 1996)

(collecting cases). Moreover, while Defendant might argue that he never directly communicated

with any of the other Plaintiffs outside of Jaroslawicz, courts in the Second Circuit have deemed

the element of reliance satisfied even where the representations are made indirectly or through a

third-party, so long as the defendant purposefully made false statements to one party knowing

that his misrepresentations would be communicated to the plaintiffs. *See, e.g.*, *Amusement*

*Indus. v. Stern*, 786 F. Supp. 2d 758, 772–73 (S.D.N.Y. 2011), *adopted by* 07 Civ. 11586 (LAK),

2011 U.S. Dist. LEXIS 25154 (S.D.N.Y., Mar. 11, 2011) ("[A] claim for fraud may lie even

when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if

(1) the plaintiff received the information from someone who had received it from the defendant,

and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff].") (quoting

*Turtur v. Rothschild Registry Int'l*, 26 F.3d 304, 310 (2d Cir. 1994)) (brackets in original).

Lastly, to the extent Defendant tries to blame Plaintiffs' losses on the failing

economy and real estate market in Romanian, his argument is unavailing. Plaintiffs' damages

clearly were caused by the fact that Defendant placed mortgages upon the Romanian Properties

and then never made interest payments. Had Defendant been honest to Plaintiffs with respect to

his intent to mortgage the Romanian Properties and to not make interest payments using his own

resources, Plaintiffs would never had entrusted him with more than sixteen million dollars to

invest in the Romanian Real Estate Venture. Importantly, had Defendant not encumbered the

Romanian Properties with mortgages or had Defendant continued making the interest payments

as he was obligated to do, the Romanian Properties obviously would not have been foreclosed

upon and Plaintiffs would still own the subject properties.

### C.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(4)

To reiterate, Defendant's failure to preserve records has crippled Plaintiffs' ability to get a full picture of the extent of Defendant's embezzlement of their investment in the Romanian Real Estate Venture.  However, with that be that being said, Plaintiffs have still gathered sufficient evidence to establish that Defendant did, in fact, embezzle investment funds, thereby warranting a denial of discharge pursuant to 11 U.S.C. § 523(a)(4).

### 1.    The Elements of a Claim Pursuant to 11 U.S.C. § 523(a)(4)

Under 11 U.S.C. § 523(a)(4), dischargeability is not permitted where the debt is, *inter alia*, the result of embezzlement on the part of Defendant.  11 U.S.C. § 523(a)(4) ("A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . .  for … embezzlement[.]).  "Embezzlement under [this section] is to be determined under federal common law, which defines it as the fraudulent appropriation of money by a person to whom such property had been entrusted or into whose hands it has lawfully come."  *Control Module, Inc. v. Dybowski (In re Dybowski)*, CHAPTER 7, CASE NO. 07-21152, ADV. PRO. NOS. 07-02051, RE: ADV. ECF NOS. 142, 163, 2012 Bankr. LEXIS 2423, at *40–41 (Bankr. D. Conn. May 29, 2012) (quoting *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 74 (Bankr. S.D.N.Y. 1993)).

In this context, an embezzlement claim has five elements: "(1) entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud."  *In re Garland*, 501 B.R. 195, 201–02 (Bankr. S.D.N.Y. 2013) (quoting *Yankowitz Law Firm, P.C. v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 647 (Bankr. E.D.N.Y. 2013)).  "An objecting creditor bears the ultimate burden of persuading the Court on the elements of non-dischargeability under Section 523(a)(4) by a preponderance of the evidence."  *Maciolek v. Firer (In re Firer)*, 317 B.R. 457, 465 (Bankr. D. Conn. 2004).

24

2.    **Summary of Facts Relied upon to Establish Each Element of Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(4)**

As indicated above, despite repeated and continuous requests, Defendant has never provided Plaintiffs with proper accountings with respect to the investment funds to which he was entrusted.  Instead, Defendant has only provided Plaintiffs with a self-serving spreadsheet without any actual documentation of expenses (*see* PX-17, 1446-1480), claiming said records are with the Judicial Administrator in Romania and the he did not retain any copies.

Due to this lack of documentation, Plaintiff has been unable to gain a full picture of the entire scope of Defendant's embezzlement of their funds.  However, Plaintiffs have uncovered some examples of Defendant's misconduct for purposes of satisfying § 523(a)(4).

For instance, Freund gave Defendant approximately $150,000 to Defendant in early 2007 to be used for the purchase of a Romanian Property in Kluj.  Another investor also gave Defendant approximately $345,000 in investment funds to be used for the purchase of the Kluj property.  Yet, when the buyer for that property defaulted, Defendant did not return any money to Freund and or to the other investor based upon their investment in Kluj., in spite of the fact that Defendant collected $1.5 million as a result of the buyer defaulting.  Instead, Defendant used $500,000 of the $1.5 million he collected to make interest payments on the mortgages rather than making the interest payments using his own money as he was obligated to do.  Defendant has been unable to account for the balance of the $1.5 million he collected and cannot account for the money he owes Freund and the other investor, including the profits they should have received from the $1.5 million he collected.

Likewise, two other investors provided a total of $675,000 for the purchase of a specific Romanian Property by the lake in Brasov.  Again, although the property was never purchased, Defendant failed to return the funds to the investors and cannot account for them.

Also, as discussed above, Defendant began claiming in 2010 that Vladarean stole €345,330 of the investors' funds in 2006.  However, Defendant has no documentation to verify this claim or to show that he even provided these funds to Vladarean, nor any explanation as to why it took him four years to realize that this sizeable amount of money was missing.

Defendant has also admitted that he used Plaintiffs' money to pay for his apartment in Romania, and in emails between him and Jaroslawicz, Defendant instructed that wire transfers from the Plaintiffs be made directly into his personal bank accounts rather than into accounts owned by the ROMUSA LLCs.  Defendant further admitted in conversations with Jaroslawicz that he was traveling throughout Europe and entertaining women during this same period.  As such, Defendant's commingling of investment funds with his own personal expenses in conjunction with his extravagant lifestyle while in Romania suggests that Defendant was misappropriating Plaintiffs' investment funds.

Further, Defendant admits to using investment funds to pay for the interest payments on the mortgages on the Romanian Properties, as described above.  Indeed, as soon as interest payments became due on the mortgages in 2007, Defendant began diverting investor funds to make said payments.  *See* Def. Dep., pp. 146:20–147:15.  He also made interest payments using a €298,000 deposit that was returned to him in connection with a Romanian Properties located in Silver Mountain.  *See* Def. Dep., pp. 152:9–155:3.  However, the interest payments were Defendant's sole responsibility, and thus, by instead using investment funds for Plaintiffs to make these payments, Defendant clearly committed embezzlement.

Lastly, believing Defendant would act honestly in connection therewith, Jaroslawicz executed two powers of attorney in favor of Defendant, thus further obligating Defendant to act as a fiduciary, including, *inter alia*, providing Jaroslawicz accountings for the

investment funds to which he was entrusted.  Nevertheless, Steinberg continued to fail to do so, thereby concealing his fraud and the fact that he was embezzling the Plaintiffs' investment funds with which he was entrusted as a fiduciary, including, for example, wrongly using these funds to make the interest payments on the mortgages.  *See* Def. Dep., pp. 146:20–147:15; 152:9–155:3.

As demonstrated, Plaintiffs entrusted defendant with more than sixteen million dollars to invest in the Romanian Real Estate Venture.  Yet, rather than use this money for its intended purpose, Defendant instead used it toward interest payments that he was obligated to make and to finance his own lifestyle in Romania.  As such, the Court should deny discharge pursuant to 11 U.S.C. § 523(a)(4).  *In re Garland*, 501 B.R. at 201–02.

### 3.    Evidentiary Issues Anticipated at Trial

To the extent Defendant contends that Plaintiffs have failed to meet their burden of proof under 11 U.S.C. § 523(a)(4), such an argument is unjustified in light of the fact that Defendant did not maintain copies of the records he gave to the Romanian Judicial Administrator.  Indeed, if Defendant had prepared proper accountings and maintained copies of the records currently in possession of the Judicial Administrator, Plaintiffs would be able to provide the Court with an even clearer picture of how Defendant embezzled and squandered their investment funds on his own vices.  However, Plaintiffs should not be penalized on account of Defendant's failure to preserve adequate records for the Romanian Real Estate Venture.

### D.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(6)

Defendant's actions with respect to the Romanian Real Estate Venture also constitute willful and malicious injury under 11 U.S.C. § 523(a)(6).  Indeed, although entrusted to responsibly invest the more than sixteen million dollars provided to him from Plaintiffs in Romanian Properties, Defendant carelessly and with complete disregard to Plaintiffs' interest

27

mishandled the Plaintiffs' investment funds by encumbering the Romanian Properties with

mortgages and never making the interest payments he was required to make.  For these reasons,

Defendant's debt to Plaintiffs should also be denied discharge pursuant to 11 U.S.C. § 523(a)(6).

### 1.    Statement of the Elements of a 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code allows for an exception to

dischargeability where the debt in question is the result of "willful and malicious injury by the

debtor to another entity or to the property of another entity."

In this context, the term "willful" means "a deliberate or intentional *injury*, not

merely a deliberate or intentional act that leads to injury."  *Strauss v. Strauss (In re Strauss)*,

2006 Bankr. LEXIS 2219, at *6 (Bankr. S.D.N.Y. July 21, 2006) (*citing Kawaauhau v. Geiger*,

523 U.S. 57, 61 n.3, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)) (emphasis in original).  The

requirement is satisfied "if the debtor had actual knowledge that he or she was violating the law

and the intent to bring about injury."  *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar)*, 368

B.R. 120, 127–28 (Bankr. E.D.N.Y. 2007).

Meanwhile, for the purpose of 11 U.S.C. § 523(a)(6), the term "malicious"

includes actual and constructive malice, but personal animus is not necessary. *See Navistar Fin.*

*Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87–88 (2d Cir. 1996) ("The term 'malicious' means

wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-

will."); *see also In re Stelluti*, 94 F.3d 84, 88 (2d Cir. 1996) ("Constructive or implied malice can

be found if the nature of the act itself implies a sufficient degree of malice.")  This element "may

be found either upon a finding of actual malevolence or ill will, or upon a finding of aggravated,

socially reprehensible conduct sufficient to justify an imputation of malice to the debtor." *Bundy*

*Am. Corp. v. Blankfort (In re Blankfort),* 217 B.R. 138, 146 (Bankr. S.D.N.Y. 1998).

### 2.    Summary of Facts Relied upon to Establish Each Element of Plaintiffs' Claim Pursuant to 11 U.S.C. § 523(a)(6)

Here, Defendant intentionally and maliciously caused the Romanian Properties that were purchased with money entrusted to Defendant by Plaintiffs to be burdened with mortgages in the amount of nine million euro and then caused said mortgages to be foreclosed upon when he failed to make the necessary interest payments as he was obligated to do. As discussed at length above, Defendant promised Plaintiffs that he would make the interest payments with no intent on fulfilling this promise, knowing that his actions would expose Plaintiffs' more than sixteen million dollar investment to great injury.

Thus, Defendant's debts to Plaintiffs are non-dischargeable under § 523(a)(2)(A).

### 3.    Evidentiary Issues Anticipated at Trial

Plaintiffs respectfully refer the Court to the evidentiary issues discussed in connection with Plaintiffs' claims pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4) for an analysis of those issues that may also be presented by Plaintiff's' 11 U.S.C. § 523(a)(6) claim.

### E.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(2)(A)

Defendant should also be denied a discharge of his debts to Plaintiffs under 11 U.S.C. § 727(a)(2)(A). The evidence that will be presented at trial will show that Defendant diverted personal assets to Channa within one year of the filing date of the bankruptcy case.

### 1.    Statement of the Elements of a 11 U.S.C. § 727(a)(2) Claim

Pursuant to 11 U.S.C. § 727(a)(2), "the court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . , has transferred . . . , or concealed, or has permitted to be transferred or concealed . . . property of the debtor, within one year before the date of the filing of the petition."

To sustain an objection to discharge under § 727(a)(2), a plaintiff must prove:

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition;

(2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

(3) that the act was that of the Debtor or his duly authorized agent;

(4) that the act consisted of transferring, removing, destroying or concealing any of the Debtor's property, or permitting any of these acts to be done.

*Minsky v. Silverstein*, 151 B.R. 657, 660–61 (Bankr. E.D.N.Y. 1993).

"Fraudulent intent may be inferred by circumstantial evidence or inferences drawn from a course of conduct." *Pereira*, 384 B.R. at 633 (Glenn, J.) (citing *In re Handel*, 266 B.R. 585, 588–89 (Bankr. S.D.N.Y. 2001)).   As this Court has articulated,

[t]he badges of fraud often cited as circumstantial evidence of intent are (i) lack or inadequacy of consideration, (ii) a family, friendship, or close associated relationship between the parties; (iii) the retention of position, benefit, or use of the property in question; (iv) the financial condition of the party sought to be charged both before and after the transaction in question; (v) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency of suit by creditors; and (vi) the general chronology of the events and transaction.

*Id.* (citing *In re Handel*, 266 B.R. at 589).  Importantly, "[t]he fact that property has been gratuitously transferred raises a presumption that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge under 727(a)(2)." *Minsky*, 151 B.R. at 660–61.

### 2.    Summary of Facts Relied upon to Establish Each Element of Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(2)

Plaintiffs have reason to infer that Defendant has transferred a carry forward loss, which was claimed on the basis of losses in Romania, to his wife Channa.   Specifically, in an email exchange, Defendant's accountants discuss transferring this carry-forward loss to Channa

30

in connection with Channa and Defendant's 2014 joint tax return file.  *See* PX-28, BC000032.

Despite demand by Plaintiffs, Defendant has yet to produce his 2014 joint tax return, making it

impossible for Plaintiffs to verify whether Defendant did in fact transfer the carry-forward loss.

However, any carry-forward loss would belong to Defendant's bankruptcy estate

and, hence, any transfer would be designed to interfere with Plaintiffs ability to recoup their

losses from Defendant.  Thus, if Defendant's 2014 tax returns show that he did transfer the carry-

forward loss to Channa, his discharge must be denied pursuant to § 727(a)(3).  Also, in the event

Defendant does not provide his 2014 tax returns, which he is required to file by October 15,

2015, the Court should draw an unfavorable inference that he transferred to carry-forward loss to

Channa, especially in light of the aforesaid email exchange between Defendant's accountants.

### 3.    Evidentiary Issues Anticipated at Trial

While Defendant may allege that there is no evidence demonstrating that he ever

fraudulently intended to transfer a carry forward loss to Channa, case law is clear that

"[t]ransactions between husband and wife must be closely scrutinized to assure that they are fair

and honest and not merely contrivances resorted to for the purpose of placing a spouse's property

beyond the reach of creditors."  *In re Carl*, 517 B.R. 53, 64 (Bankr. N.D.N.Y. 2014).  Thus, the

"[t]ransfer of property by a debtor to his spouse, during a period of insolvency, while retaining

use and enjoyment of the property, is a classic badge of fraud."  *Id*. at 64–65.

### F.    Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(4)(A)

As a final matter, Defendant has admitted at his deposition that he did not disclose

that he is presently maintaining an apartment in Romania as part of the underlying bankruptcy

action.  Defendant also did not disclose a personal bank account that he has in Romania.

Accordingly, pursuant to 11 U.S.C. § 727(a)(4)(A), Defendant is not entitled to a discharge.

31

1.        **Statement of the Elements of a 11 U.S.C. § 727(a)(4)(A) Claim**

A bankruptcy court can deny a debtor a discharge where "the debtor knowingly

and fraudulently, in or in connection with the case . . . (A) made a false oath or account; or

(B) presented or used a false claim[,]" in accordance with 11 U.S.C. § 727(a)(4).  Importantly,

> an omission alone from the debtor's statement of affairs or
> schedules is grounds for denying a discharge.  If a debtor fails to
> fully provide information that is required, the debtor will be denied
> a discharge under § 727(a)(4).  Of course, a debtor may . . . make a
> misstatement and prove that the misstatement caused minimal
> harm to the estate.  However, the determination of relevance and
> importance of the question is not for the debtor to make.

*HSBC Bank USA v. Handel (In re Handel)*, 266 B.R. 585, 590, 2001 Bankr. LEXIS 1210, *7-8

(Bankr. S.D.N.Y. 2001) (citations and internal quotation marks omitted).

2.        **Summary of Facts Relied upon to Establish Each Element of
         Plaintiffs' Claim Pursuant to 11 U.S.C. § 727(a)(4)(A)**

Here, Defendant conceded at his deposition that he failed to disclose a lease on a

Romanian apartment he maintains in his Bankruptcy Schedules.  He has further failed to disclose

a personal bank account in Romania.  *See* PX-78, BC001189-1192.  Defendant also presented

blatantly false testimony in his deposition with respect to his claim that he never represented that

he would be responsible for making interest payments upon the mortgages.  Based on the

foregoing, pursuant to 11 U.S.C. § 727(a)(4)(A), Defendant is not entitled to a discharge.

3.        **Evidentiary Issues Anticipated at Trial**

Although Defendant may wish to diminish his omissions and false testimony,

Plaintiffs have furnished enough proof to establish their 11 U.S.C. § 727(a)(4)(A) claim.

With respect to Defendant's failure to disclose his Romanian apartment and his

Romanian bank accounts, courts have viewed such omissions as fatal to discharge under 11

U.S.C. § 727(a)(4)(A).  *See, e.g.*, *Agai v. Antoniou (In re Antoniou)*, 515 B.R. 9, 23–24 (Bankr.

32

E.D.N.Y. 2014)  ("The Debtor filed this case on July 31, 2012 . . . [but] did not disclose the existence of the Bank Account or the transfers to the Bank Account until April 25, 2014. Moreover, the Debtor did not disclose the existence of the Bank Account voluntarily; it came to light only as a result of Plaintiffs' discovery   taken of Centex. This is precisely the type of conduct § 727(a)(4)(A) is designed to prevent.") (citations omitted).

As to Defendant's false testimony concerning his obligation to pay the interest payments upon the mortgages, as detailed above, Defendant has advanced no reasonable explanation for why Plaintiffs would allow Defendant to cover his share of the Romanian Real Estate Venture with a bank loan obtained through mortgaging the Romanian Properties, thereby risking their sixteen million dollar investment, but then not even make him pay for the interest payments on these mortgages.  There is simply no credibility to Defendant's story and thus, the falseness of his testimony can be inferred.  More importantly, emails exchanged between Defendant and Jaroslawicz indicate that Defendant was solely responsible for making the interest payments for the mortgages, again indicating that Defendant was lying when he said that he never agreed to be obligated to personally make these payments.  *See, e.g.*, PX-4 (EE1201–03); PX-5 (EE1162); PX-6 (EE1193); PX-7 (EE1055); PX-8 (EE1059).

## DEFENDANT'S COUNTERCLAIM

In his Counterclaim, Defendant seeks to hold Jaroslawicz liable for indemnification based upon Jaroslawicz's execution of a power of attorney on May 19, 2008. However, as will be demonstrated herein, Defendant's Counterclaim is completely without merit.

### 1.    Statement of the Elements to a Defense to a Claim for Indemnification

New York law is crystal clear that an indemnification clause does not apply to attorneys' fees resulting from litigation between the parties to the contract unless the intention to

do so is specifically referenced in the contract at hand.  *See Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491–92, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989) (internal citations omitted) ("Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, *the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise*.") (emphasis supplied).  Indeed, "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.  The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances."  *Id*. (collecting cases).

## 2.  Summary of Facts Relied upon to Establish a Defense to Defendant's Claim for Indemnification

Crucially, despite Defendant's claims to the contrary, there is absolutely no clause in the May 19, 2008 power of attorney that would obligate Jaroslawicz to pay for any losses or attorneys' fees resulting from litigation between Jaroslawicz and Defendant.  Rather, the power of attorney only provides, in relevant part, as follows:

> I hereby guarantee that my attorneys will be exonerated of any liability or any losses and damages that may occur, arising from or in connection with fulfilling the present power of attorney.

PX-120, 1019.

Clearly, this provision relates to litigation involving third parties concerning the ROMUSA LLCs and Romanian Properties.  The parties certainly never intended that Jaroslawicz would be indemnifying Defendant for a lawsuit for damages caused by, *inter alia*, the fraudulent acts committed by Defendant against Jaroslawicz and the other Plaintiffs.  In fact, Jaroslawicz's

testimony at trial will demonstrate that this provision was limited in scope and only concerned

litigation arising with third parties with respect to the Romanian Properties.

As a final matter, Defendant has admitted that he is not even paying for his legal

fees.  Rather, Channa is paying for Defendant's attorneys.  Nowhere does the power of attorney

require Jaroslawicz to indemnify Channa, making Defendant's Counterclaim wholly unavailing.

### 3. Evidentiary Issues Anticipated at Trial

Defendant has attempted to use the word "any" in the above-quoted provision

from the May 19, 2008 power attorney to support of his erroneous claim for indemnification.

However, case law is clear that "[c]ontrary to [his] contention, [Jaroslawicz's] obligation to

indemnify was not broadened by the 'any['] . . . language in the indemnification provision." *Van

Deventer v. CS SCF Mgt. Ltd.*, 47 A.D.3d 503, 504 (1st Dep't 2008).  Thus, it is respectfully

submitted that Defendant's counterclaim against Jaroslawicz be dismissed with prejudice.

### <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs will meet their burden of proof with respect to

the above provisions of the Bankruptcy Code.  Accordingly, judgment on the Complaint should

be granted, and Defendant's counterclaim against Jaroslawicz must be dismissed with prejudice.

Dated:  October 8, 2015

Respectfully submitted,

**REISMAN PEIREZ REISMAN & CAPOBIANCO LLP**

By:      */s/ Jerome Reisman*
   Jerome Reisman (JR-0933)
1305 Franklin Avenue, PO Box 119
Garden City, New York 11530
(516) 746-7799
*Attorneys for Plaintiffs David Jaroslawicz,
David Walker, Howard Freund, Neil Herskowitz,
Phil Lifschitz and Abraham Elias*