**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

In re:                                                                    NOT FOR PUBLICATION

        SAMUEL STEINBERG                          Chapter 7
        a/k/a SAM STEINBERG,
                                                                          Case No. 14-10845-MG
              Debtor.


-------------------------------------------------------------

DAVID JAROSLAWICZ, DAVID WALKER,
HOWARD FREUND, NEIL HERSKOWITZ,   Adv. Proc. No. 14-02426
PHIL LIFSCHITZ, and ABRAHAM ELIAS,

              Plaintiffs,

       -against-

SAMUEL STEINBERG a/k/a SAM STEINBERG,

              Defendant.
-------------------------------------------------------------

### MEMORANDUM OPINION AND ORDER AFTER TRIAL OF INVESTOR PLAINTIFFS' OBJECTION TO THE DISCHARGEABILITY OF THE ALLEGED DEBTS OWED BY DEFENDANT SAMUEL STEINBERG

*A P P E A R A N C E S:*

REISMAN, PEIREZ, REISMAN &
CAPOBIANCO, LLP
*Attorneys for the Plaintiffs*
1305 Franklin Avenue, P.O. Box 119
Garden City, New York 11530
By:    Jerome Reisman, Esq.
        Kevin Scully, Esq.
        Lisa A. Guinta, Esq.

WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP
*Attorneys for Defendant Samuel Steinberg*
1201 RXR Plaza
Uniondale, New York 11556
By:    Richard F. Harrison, Esq.
        Eric G. Waxman III, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding arises from a failed multi-million business venture that lacked the simplest corporate formalities and was virtually undocumented.  As detailed below, in 2006, David Jaroslawicz and Samuel Steinberg entered into a verbal agreement to acquire real estate in Romania at a time the market was prospering, shortly before Romania joined the European Union on January 1, 2007.  Jaroslawicz and Steinberg were hugely successful with the first property they purchased, more than doubling their money by flipping the property in 5 months. This success whetted their appetites, leading them to purchase other properties for increasingly large sums, mostly raised from Jaroslawicz's wealthy friends or acquaintances.  Jaroslawicz solicited investments from individuals, including Howard Freund, Neil Herkowitz, and Phil Lifschitz (collectively and together with Jaroslawicz, the "Investor Plaintiffs").  There are no written agreements between Steinberg, Jaroslawicz and any of the investors.  The business venture failed after the worldwide real estate market collapsed.  In June 2013, Steinberg commenced Romanian insolvency proceedings for the business venture.  Some of the Plaintiffs then filed an involuntary chapter 7 case against Steinberg, followed by this denial of discharge adversary proceeding.

The Investor Plaintiffs object to the discharge of the alleged debts they claim are owed by Steinberg to the Investor Plaintiffs, in the amount of $16,754,000, on the grounds that, among other things, Steinberg allegedly defrauded the Investor Plaintiffs, embezzled the money that they had entrusted to him to invest in the real estate venture in Romania (the "Romanian Real Estate Venture") and failed to account for the funds Steinberg received from them.  Additionally, Investor Plaintiffs and Plaintiffs David Walker and Abraham Elias (together with Walker and the Investor Plaintiffs, the "Plaintiffs") object to Steinberg's general discharge on the grounds that

Steinberg failed to preserve records, transferred assets within one year of commencing the underlying bankruptcy case and made false oaths and material omissions in connection with the underlying bankruptcy case.

The Court held a trial in this adversary proceeding from December 7–10, 2015, with the closing arguments on February 5, 2016. The findings of fact and conclusions of law set forth in this Opinion constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In making the findings of fact, the Court considered the credibility of the witnesses based on the Court's observation of their live testimony and the rest of the evidence introduced at trial.

The Court concludes, for the reasons explained below, that judgement should be entered in favor of Steinberg, dismissing the Complaint with prejudice. With respect to Steinberg's Counterclaim, the Court concludes that judgment should be entered against Steinberg, dismissing the Counterclaim with prejudice.

## I.    GENERAL BACKGROUND

Jaroslawicz and Steinberg have known one another since the early 1990s. (Dec. 7, 2015 Hr'g Tr. at 34:3–9.) They were acquaintances, belonging to the same Orthodox synagogue, living in the same neighborhood, engaging in business ventures together and socializing occasionally with one another and with their spouses. (*Id.* at 34:10–13.) Jaroslawicz is a seasoned attorney who occasionally pursues lucrative investment opportunities and on various occasions, Jaroslawicz provided Steinberg with legal advice. Over the years, Jaroslawicz became generally familiar with the financial status of Steinberg, Steinberg's wife, and Steinberg's father-in-law, Israel Taub ("Taub"), a very successful New York real estate investor.

Steinberg had an assortment of odd jobs and business ventures over the years, including owning

and operating a discount wholesale business.

In late 2005, Steinberg approached Jaroslawicz regarding an investment opportunity in

Romania.  (Dec. 7, 2015 Hr'g Tr. at 167:25–168:5.)  In early 2006, Steinberg and Jaroslawicz

traveled together to Romania to tour various locations and explore the opportunity to invest and

acquire Romanian real estate.  (*Id.* at 168:14–20.)  During the trip, Jaroslawicz and Steinberg

decided to invest in real estate in Romania.  (*Id.* at 171:14–20.)  During that same trip, Steinberg

and Jaroslawicz visited a bank where Steinberg provided a bank statement from Taub's real

estate business to an employee of the Romanian Bank. (*Id.* at 168:14–20.)  Steinberg contends

that he showed Taub's bank statement to the bank employee to demonstrate that he came from a

wealthy family, nothing more.  (*Id.* at 137:22–138:21.)

Jaroslawicz and Steinberg orally agreed to invest and acquire real estate located in

Romania.  (Pretrial Order, ECF Doc. # 98 at 3; Compl. ¶ 21.)  The exact terms governing this

investment venture were never formalized.  Both Jaroslawicz and Steinberg said that it was

common in their Orthodox Jewish community to enter into business ventures without a written

agreement.  The parties never executed a written agreement memorializing the terms of the

venture; they had no budget, no pro forma financial statements and no designated minimum

capital or term for the venture.  (Def. FoF, ECF Doc. # 65 at 3.)  Consequently, the exact terms

governing the investment venture are disputed by the parties.

The Plaintiffs contend that Steinberg and Jaroslawicz each agreed to invest an equal

amount of money to purchase the various Romanian properties, which were to remain free of any

mortgages.  (Pretrial Order at 5.)  In Jaroslawicz's own words, "[they would] each put up fifty

percent of the money, and [they] share half of the losses and the profits."  (Dec. 9, 2015 Hr'g Tr.

at 15:9–10.)  The parties contend that Steinberg indicated that he had money from the sale of his apartment to invest in the Romanian venture.[1]  (*See generally* Dec. 7, 2015 Hr'g Tr. at 174–5.)  Steinberg agrees that he and Jaroslawicz were fifty-fifty partners; any profit on the sale of the Romanian investment properties was to be split equally between them as they were fifty-fifty partners.  (*Id.* at 172:4–10; *see also* Def. FoF at 3–4.)  However, Steinberg disputes the contention that the Romanian properties were to remain free of mortgages.[2]

To further complicate matters, in early 2006, and, apparently, throughout the venture, Jaroslawicz approached various third-parties regarding the Romanian Real Estate Venture.  The individuals decided to invest in the Romanian Real Estate Venture and provided investments funds directly to Jaroslawicz.  (Def. FoF at 4.)  In turn, Jaroslawicz forwarded or directed the investment proceeds to Steinberg.  There are no written agreements between Jaroslawicz and any of the third-party investors concerning these side deals (Dec. 9, 2015 Hr'g Tr. at 42:21–22); and the exact terms governing these investments are unclear.  However, based on Jaroslawicz's testimony, it appears that various side deals may have altered the original agreement between Steinberg and Jaroslawicz to divide business profits equally.

---

[1]    Jaroslawicz alleges that Steinberg intentionally exaggerated the proceeds from the sale of the apartment that would be available to invest in the Romanian Real Estate Venture.  Jaroslawicz testified that Steinberg told him that he had sold his apartment for $6.5 million.  (Dec. 9, 2015, Hr'g Tr. at 8:16–24.)  Jaroslawicz assumed that entire amount would be available to invest in the business.  Steinberg testified that he told Jaroslawicz that the total proceeds from the apartment sale were approximately $6 million, but after repayment of the mortgage and a loan from Taub, among other things, Steinberg and his wife were left with approximately $2.5 million.  (Dec. 7, 2015, Hr'g Tr. at 174:18–21.)

[2]    The Complaint alleged that the Romanian properties would not be mortgaged.  (Compl ¶ 28 (alleging that the Investor Plaintiffs would have never invested large sums if they knew that the Romanian properties were to be mortgaged).)  Lifschitz and Herskowitz testified to this.  Additionally, Jaroslawicz supported this allegation in his testimony (*Cf.* Dec. 9, 2015 Hr'g Tr. at 166:24–167:4 (Jaroslawicz testifying that he refused to sign the Romanian Mortgage documents until Steinberg agreed that he and his family would be responsible for the mortgage and interest payments)) and Lifschitz   While that might have been their early plan, Jaroslawicz's testimony was completely lacking in credibility.  As explained below, Jaroslawicz signed numerous documents approving *every* mortgage that Steinberg obtained secured by the Romanian properties.  Jaroslawicz apparently did not inform the Investor Plaintiffs that he had approved each of the mortgages.

For example, Jaroslawicz testified at trial that Manouchehr Malekan made an investment in the Romanian Real Estate Venture. (*See* Dec. 9, 2015 Hr'g Tr. 16:16–17:7.)  At one point Malekan contributed approximately $690,000 to purchase the Cluj real estate property ("Cluj"). (*Id.*)  According to Jaroslawicz, half of the contribution was intended to be a one-year interest free loan and, the other half of the contribution was an equity investment. (*Id.*)  According to Jaroslawicz, he and Steinberg were to share fifty-percent of the profits with Malekan. (*Id.*)  In other words, Jaroslawicz and Steinberg would each receive a quarter of the profits and Malekan would receive the remaining fifty-percent.  It is unclear whether this alleged profit sharing agreement impacted only the proceeds generated from the Cluj acquisition (or one of the Cluj properties, as Jaroslawicz testified that there were multiple Cluj properties) or whether this alleged profit sharing agreement related to profits of the Romanian Real Estate Venture, as a whole.

Steinberg's trial testimony directly contradicts Jaroslawicz's testimony.  Steinberg testified that he was unaware that the $690,000 was contributed by Malekan.  Steinberg testified that he was unaware that Malekan existed until 2010, at which point Malekan sent an email to Steinberg introducing himself. (*See* Dec. 7, 2015 Hr'g Tr. at 193:11–22.)

Jaroslawicz also testified that he made a "similar deal," as with Malekan, with another investor in connection with a $675,000 contribution for the acquisition of the Brasov Lake real estate acquisition (the "Brasov Lake Investment"). (*See* Dec. 9, 2015 Hr'g Tr. at 17:11–25.)  Subsequently, Jaroslawicz testified that the "675 for the lake property" was invested by two individuals, "Stahler and Renov." (*Id.* at 40:3–15.)  According to Jaroslawicz, half of the money was supposed to be a loan, and the other half was an investment. (*Id.* at 40:12–15.)

Jaroslawicz also testified that he received investment proceeds from another individual, Alexander Fisher, who "drove a pretty hard bargain." (*See id.* at 43:8–22.) Specifically, Jaroslawicz testified that the agreement was that "[Fisher would] get double [his] money, [and] [Jaroslawicz and, ostensibly Steinberg] get nothing. But [Jaroslawicz and, ostensibly Steinberg didn't] have to pay interest, because its investment. [After Fisher received] back double [his investment], [Jaroslawicz and, ostensibly Steinberg would] get twenty percent." (*Id.*)

The investments detailed above encompass only some of the complex investments that Jaroslawicz solicited and obtained for the Romanian Real Estate Venture. Jaroslawicz entered into an array of side-deals with numerous third-parties, containing profit-sharing agreements that were apparently incompatible with Jaroslawicz's original deal with Steinberg to spilt profits equally between themselves. Moreover, it is unclear how each side-deal could co-exist with the various other side-deals that Jaroslawicz had brokered.

Meanwhile, Steinberg "was the man on the ground" in Romania. (Dec. 7, 2015 Hr'g Tr. 155:16–24.) He secured office space in Romania, as well as the services of bookkeepers, accountants, and Romanian lawyers to assist in the parties' transactions. (Def. FoF at 5–6.) On or between February 2006 and June 2006, Steinberg formed and registered three limited liability companies under Romanian law: (i) Romusa Real Estate Holding S.R.L; (ii) Romusa Investments S.R.L. and (iii) Romusa Holding S.R.L. (collectively, the "Romusa LLCs"). (Pretrial Order at 3.) No operating agreements were prepared for the Romusa LLCs. (*Id.*)

In or about August 2006, Steinberg formed a New York limited liability company called Kluj Properties, LLC (the "Kluj LLC"). (*Id.*) Again, no operating agreement was prepared for

Kluj LLC.  (*Id.*)  During all relevant times, Steinberg and Jaroslawicz co-owned the Romusa LLCs and the Kluj LLC.[3]  (*Id.*)

In or about April 2007, the Plaintiffs contend that Steinberg notified Jaroslawicz that he intended to place mortgages on the Romanian properties in order to get a bank loan to further fund the Romanian Real Estate Venture.  (Pls. FoF, ECF Doc. # 63 at 8.)  Between 2007 and 2011, Steinberg and Jaroslawicz executed various apostilles to encumber one or more of the Romanian properties with mortgages.  (*See* Ex. C.)  Specifically, Jaroslawicz executed the following apostilles (collectively, the "Apostilles"):

- Apostille and Bank Resolution, dated April 24, 2007, in the amount of €2,500,000;
- Apostille and Bank Resolution, dated November 16, 2007, in the amount of €2,500,000;
- Apostille and Power of Attorney, dated May 6, 2008;
- Apostille and Resolution, dated May 8, 2008, in the amount of €1,000,000;
- Apostille and Resolution, dated May 24, 2011, increasing the amount of a credit facility from €2,500,000 to €3,200,000; and
- Apostille and Resolution, dated March 16, 2007.

Between 2007 and 2008, Jaroslawicz executed general Powers of Attorney in favor of Steinberg in connection with the acquisition of various properties:

- In March 2007, Jaroslawicz executed a general power of attorney to Steinberg in connection with the mortgage of a certain property described as "Brasov 40."  (Ex. C, sub(f)).  In April 2007, Jaroslawicz executed minutes containing the terms of the borrowing for the "Brasov 40" mortgage.  (*Id.*)

- On November 16, 2007, Jaroslawicz executed minutes containing the terms of a mortgage on a property described as "Cluj" (Ex. C, sub(b)) and an additional power of attorney from Jaroslawicz to Steinberg concerning the Cluj transaction.  (*Id.*)

- On May 16, 2008, Jaroslawicz executed another power of attorney running to Steinberg, which covered each of the three Romusa LLCs. (Ex. C, sub(c)).  (*Id.*)

On February 4, 2008, Jaroslawicz executed minutes reflecting the terms of a mortgage for a property described as Poiana. (*See* Ex. C, sub(d).)  On May 24, 2011, Romusa Investments

---

[3]    At one point in time, a colleague of Steinberg, Nicholai Canetti, was also given a ten percent (10%) interest in the Romusa LLCs.  (Pretrial Order at 3.)

S.R.L. extended the term of its credit facility of April 2007 with Marfin Bank from May 28, 2011, to May 28, 2013.  (*Id.*)  The extension was affected in a writing prepared by Marfin Bank reciting the terms of the prior credit facility and the terms of the extension agreement.  (*Id.* at 3– 4.)  The extension agreement was executed by Steinberg and Jaroslawicz.  (*Id.* at 4.)  Through the Apostilles and the minutes, Jaroslawicz and Steinberg caused the Romusa LLCs to be encumbered along with the subject properties (collectively, the "Romanian Mortgages").

In June 2013, Steinberg commenced Romanian insolvency proceedings for each of the Romusa LLCs.  (*Id.*)

On March 28, 2014, the Plaintiffs filed an involuntary chapter 7 petition against Steinberg (Case No. 14-10845-MG).  On December 4, 2014, the Plaintiffs filed a complaint objecting to the dischargeability of debts allegedly owed by Steinberg (the "Complaint," Adv. Pro. No. 14-02426-MG, ECF Doc. #1).[4]  The Defendant filed an Answer with a Counterclaim on January 5, 2015.  (Adv. Pro. No. 14-02426-MG, ECF Doc. #6.)

## II.    DISCUSSION

A bankruptcy discharge covers all prepetition debts, other than debts expressly excepted from discharge by section 523 of the Bankruptcy Code.  Consistent with the Bankruptcy Code's fresh start policy, courts nevertheless construe the exceptions enumerated in section 523 narrowly against the creditor in favor of the debtor.  *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (citing *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996)).  11 U.S.C. § 523(a) provides, in relevant part, that:

---

[4]    The Court notes that Walker and Elias are the only Plaintiffs that hold claims against Steinberg based on two judgments against Steinberg that are collectively less than $90,000. The other Plaintiffs do not hold established claims against Steinberg—they are attempting to both establish and seek nondischargeability of their claims against Steinberg through the Complaint.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

    (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

The three terms used in section 523(a)(2)(A) embody somewhat differing concepts, and Congress' "use of the disjunctive 'or' evidences [an intent] to deny a discharge under any [such term] . . . ." *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002) (citing *In re Soliz*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996)); *In re Marc Leventhal*, 194 B.R. 26, 28 (Bankr. S.D.N.Y. 1996) ("Section 523(a)(2)(A) speaks of false pretenses, a false representation, or actual fraud, evidencing a statutory distinction among the three." (internal quotation marks omitted)).

The Bankruptcy Code states that the court *shall* discharge a debtor unless one of the enumerated grounds for denial of discharge is proven. 11 U.S.C. § 727. Generally, a denial of discharge pursuant to section 727 is characterized as an extreme remedy that "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 234 (2d Cir. 2006) (citing *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotation marks omitted)). The burden of persuasion rests with the objecting party to show by a preponderance of the evidence that the Debtor is not entitled to discharge. *Adams v. Zembko (In re Zembko)*, 367 B.R. 253, 254 (Bankr. D. Conn. 2007); *Cadle Co. v. Jacobowitz (In re*

*Jacobowitz)*, 296 B.R. 666 (Bankr. S.D.N.Y. 2003); *Nisselson v. Wolfson (In re Wolfson)*, 152

B.R. 830 (Bankr. S.D.N.Y. 1993).

Bankruptcy Code section 727(a) prohibits a court from granting a debtor a discharge if,

among other things:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or
> an officer of the estate charged with custody of property under this
> title, has transferred, removed, destroyed, mutilated, or concealed,
> or has permitted to be transferred, removed, destroyed, mutilated,
> or concealed –
>
>> (A) property of the debtor, within one year before
>> the date of the filing of the petition.
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the debtor's
> financial condition or business transactions might be ascertained,
> unless such act or failure to act was justified under all of the
> circumstances of the case
>
> (4) the debtor knowingly and fraudulently, in or connection with
> the case –
>
>> (A) made a false oath or account

### A. Claim Pursuant to 11 U.S.C. § 523 (a)(2)(A) – False Pretenses, False Representation and/or Fraud

Section 523(a)(2)(A) of the Bankruptcy Code provides that an individual debtor will not

be discharged from any debt for "services" obtained by (1) false pretenses, (2) a false

representation, or (3) actual fraud—other than a statement respecting the debtor's or an insider's

financial condition. 11 U.S.C. § 523(a)(2)(A). *Lubit v. Chase*, 372 B.R. at 128. In order to

succeed on a cause of action under section 523(a)(2)(A), a creditor must establish the following

elements:

> (i)  The debtor made a false representation;
> (ii)  At the time the representation was made, the debtor knew it
> was false;
> (iii)  The debtor made the representation with the intention of
> deceiving the creditor;

(iv)  The creditor justifiably relied on the representation; and
(v)  The creditor sustained loss or damage as the proximate
consequence of the false, material misrepresentation.

*Chase Manhattan Bank, USA, N.A. v. Giuffrida (In re Giuffrida)*, 302 B.R. 119, 123 (Bankr.

E.D.N.Y. 2003); *see also In re Jacone*, 156 B.R. 740, 743 (Bankr. S.D.N.Y. 1993).

 1.  False Pretenses

Under section 523(a)(2)(A), the term "false pretenses" is defined as "conscious deceptive

or misleading conduct calculated to obtain, or deprive, another of property."  *Gentry v. Kovler*

*(In re Kovler),* 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000).  A false pretense has also been held to

be an implied misrepresentation or conduct intended to create a false impression.  *Voyatzoglou v.*

*Hambley (In re Hambley),* 329 B.R. 382 (Bankr. E.D.N.Y. 2005) (citing *In re Bozzano,* 173 B.R.

990, 993 (Bankr. M.D.N.C. 1994)).  In effect, a false pretense is designed to convey an

impression without an oral representation. *See Lubit v. Chase*, 372 B.R. at 128; *Wings v. Hoover*

*(In re Hoover),* 232 B.R. 695, 700 (Bankr. S.D. Ohio 1999); *Bobilya Chrysler v. Gross (In re*

*Gross),* 175 B.R. 277 (Bankr. N.D. Ind. 1994) (stating that causes of action for "false pretenses"

and "false representations" under section 523(a)(2)(A) are two distinct actions; the former

involves implied misrepresentations, while the latter deals with expressed, either oral or written,

misrepresentations).  In order to establish that a debt is nondischargeable as a debt for money

obtained by false pretenses, the plaintiff must establish (1) an implied misrepresentation or

conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a

contrived and misleading understanding of the transaction on the part of the plaintiff; and (4)

which wrongfully induced the plaintiff to advance money, property, or credit to the defendant.

*Lubit v. Chase*, 372 B.R. at 128 (citing *In re Dobrayel,* 287 B.R. at 12).

2.   False Representation

A court can find a false representation if the plaintiff presents proof that the defendant (1) made a false or misleading statement; (2) with the intent to deceive; and (3) in order for the plaintiff to turn over money or property to the defendant.  *Lubit v. Chase*, 372 B.R. at 128; *In re Dobrayel*, 287 B.R. at 12 (citing BLACK'S LAW DICTIONARY at 619 (7th ed. 1999)).  With respect to the second element, "intent to deceive" may be established through circumstantial evidence and inferred from the totality of the evidence presented.  *Hong Kong Deposit & Guaranty Ltd. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y. 1990) ("[I]ntent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the [creditor].").  The plaintiff must also establish justifiable reliance. *See In re Gonzalez*, 241 B.R. 67, 71 (S.D.N.Y. 1999) ("To exempt a debt from discharge under Section 523(a)(2)(A), the non-debtor's reliance must be 'justifiable' under the circumstances." (citing *Field v. Mans*, 516 U.S. 59 (1995))).

3.   Actual Fraud

"[A]ctual fraud" generally requires proving the "five fingers of fraud."  *In re Dobrayel*, 287 B.R. at 12.  The Court looks to the common law of torts, as embodied in the Restatement (Second) of Torts, in construing the elements of section 523(a)(2)(A).  *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999) (citing *Field v. Mans*, 516 U.S. 59, 70 (1995)).  Under section 525 of the Restatement, the elements of common law fraud are (1) a misrepresentation, (2) fraudulent intent, or scienter, (3) intent to induce reliance, (4) justifiable reliance, and (5) damage.  *Accord In re Alicea*, 230 B.R. at 500.  With respect to the second element, a misrepresentation is made with fraudulent intent if the maker knows or believes that his statements are false.  *Taub v. Morris (In re Morris)*, 252 B.R. 41, 48 (Bankr. S.D.N.Y. 2000);

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir. 1992).  As stated by the court in *In re Alicea*:

> The test may be stated as follows. If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made the promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

230 B.R. at 501 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997)).

4.  <u>Parties Contentions</u>

The Investor Plaintiffs contend that from 2005 to 2013, Steinberg conducted a fraudulent scheme, premised on two main alleged falsehoods: (1) misrepresentations about Steinberg's family's potential involvement in the Romanian Real Estate Venture (*i.e.*, access to family wealth) and a false representation of the amount of funds that he would have to invest in the Romanian Real Estate Venture (*i.e.*, access to personal wealth) and (2) knowingly false statements that Steinberg (or his family) would pay the interest on the Romanian Mortgages until the Romanian properties were sold when Steinberg never had any intention of doing so.  The Investor Plaintiffs allege that as a result of these misrepresentations, they suffered losses as they were induced to invest and lend over sixteen million dollars in the Romanian Real Estate Venture.

a.  *Alleged Misrepresentation Regarding Availability of Financial Resources*

The Investor Plaintiffs contend that Steinberg falsely represented his family's potential involvement in the venture and that this false representation, in part, induced the Investor Plaintiffs to invest in the Romanian Real Estate Venture.  Specifically, Jaroslawicz testified that during their trip to Romania, they visited Egnatia Bank (later Marfin Bank) and Steinberg—in

Jaroslawicz's presence—told the bank officer that he was from a wealthy real estate family in

New York. (Dec. 9, 2015 Hr'g Tr. at 11:19–25.) Further, Jaroslawicz maintains that Steinberg

took out a bank statement and showed it to the bank officer and to Jaroslawicz, demonstrating

how much money there was in the family, showing tens of millions of dollars. (*Id.* at 12:11.)

Steinberg disputes this characterization, as he testified that he brought a one-month bank

statement of Taub's companies to this meeting and showed the bank statement to the bank

officer for puffery purposes—he only had permission from Taub to use the statement for this

purpose—and to establish a banking relationship. (Dec. 7, 2015 Hr'g Tr. at 138:10–139:16.)

Further, in an email dated March 31, 2009, Steinberg wrote to Jaroslawicz that he showed the

bank statement to help them secure loans from the bank. (*See* Ex. 40 (EE 1065–66).)

Additionally, the Investor Plaintiffs allege that Steinberg falsely represented the amount of

proceeds that he would be using from the sale of his Manhattan residence to finance his share of

the venture, supported by Jaroslawicz's testimony that Steinberg told him that he had sold his

Manhattan residence for $6.5 million. (Dec. 9, 2015 Hr'g Tr. at 8:15–24.) Steinberg, in his

testimony, contests this characterization, testifying that he told Jaroslawicz that the total proceeds

from the sale of his Manhattan residence was approximately $6.5 million, but after repayment of

the mortgage and a loan from Taub, among other things, Steinberg and his wife were left with

approximately $2.5 million. (Dec. 7, 2015 Hr'g Tr. at 174:3–21.)

### b.  Alleged False Representation Regarding Payment of Interest on Romanian Mortgages

The Investor Plaintiffs contend that Steinberg false made fraudulent statements that he

would pay the interest on the Romanian Mortgages when he had no intention of doing so.

Specifically, the Investor Plaintiffs contend that Steinberg (i) never intended to pay the interest,

(ii) agreed to pay the interest on the Romanian Mortgages until the Romanian properties were

sold, and (iii) used investor funds (*i.e.*, funds other than his own) to pay the interest on the

Romanian Mortgages.  Jaroslawicz testified that he agreed to the Romanian Mortgages based on

the condition that Steinberg and his family were to be responsible for the payment of interest on

the Romanian Mortgages until the subject Romanian properties were sold.  (Dec. 9, 2015 Hr'g

Tr. at 167:24–167:4 (Jaroslawicz testifying that he "refused to sign the mortgage documents until

[Steinberg] agreed that he and his family would be responsible to pay the mortgage and interest .

. . until the property was sold or the mortgage was paid off").)

In support of the contention that Steinberg never intended to pay the interest on the

Romanian Mortgages, the Investor Plaintiffs point to Steinberg's testimony that at the time the

Romanian Mortgages were taken out, Steinberg knew that he did not have any available funds of

his own.  (Dec. 8, 2015 Hr'g Tr. at 62:23.)  Significantly, during the existence of the Romanian

Mortgages, Steinberg had access to significant amounts of capital, as he borrowed $1.575 million

from Taub over three instances from April 2007 through December 2008.  (*See* Ex. 11 at 3

(Steinberg funding chart demonstrating loans from Taub).)

The Investor Plaintiffs also contend that Steinberg said to Jaroslawicz that Steinberg

would be responsible for paying the interest on the Romanian Mortgages and handed Jaroslawicz

a writing evidencing this agreement (which Jaroslawicz does not have anymore).  (Dec. 9, 2015

Hr'g Tr. at 23:1–19 (Jaroslawicz testimony).)  However, Steinberg testified that he never agreed

to assume personal responsibility for the payment of interest on the Romanian Mortgages (Dec.

8, 2015 Hr'g Tr. at 20:25–21:16) and that Jaroslawicz never demanded that he execute a writing

assuming the interest on the Romanian Mortgages.  (Dec. 8, 2015 Hr'g Tr. at 134:12–13.)  In

further support of their contention that Steinberg agreed to be personally liable for the interest on

the Romanian Mortgages at the time the mortgages were obtained, the Investor Plaintiffs cite

several email exchanges from Steinberg to Jaroslawicz from December 2008, January 2009 and

March 2009 in which Steinberg agreed, in consideration for Jaroslawicz having procured funds

for the venture, to pay the interest on the Romanian Mortgages.  (*See, e.g.*, Ex. 5 (email dated

January 8, 2009 from Steinberg to Jaroslawicz, "David . . . as far as the bank loans; in

consideration that you are maintaining the loans that you procured for our companies, . . . [I] will

agree in the future to maintain the bank loans that [I] procured for our companies and will

provide funds to pay any interest that will be due.  As far as repayment of principal, . . . [I] intend

this to happen as such that that we sell the property . . . or to extend the loans as needed."

(ellipses in original)); Ex. 40 (email dated March 31, 2009 from Steinberg to Jaroslawicz,

"[m]eanwhile I have not obtained money for the bank mortgages . . . but I have 2 months . . . and

it will be my responsibility to do so." (ellipses in original)); *see also* Ex. 4 (email dated

December 4, 2008 from Steinberg to Jaroslawicz indicating that Steinberg procured the money

for the interest on the Romanian properties from "family money"); Ex. 6 (email dated December

9, 2008 from Steinberg to Jaroslawicz indicating that Steinberg had paid "Approx . . . 600K" for

interest on the Romanian Mortgages (ellipses in original)).)  Jaroslawicz testified that any emails

where Steinberg agreed to assume the interest on the Romanian Mortgages that were sent

contemporaneously with the imposition of the first Romanian Mortgage—*i.e.*, *ex-ante*

assumption of liability for payment of interest—he cannot locate.  (Dec. 9, 2015 Hr'g Tr. at

184:25–185:1.)

Finally, in support of this contention, the Investor Plaintiffs allege that Steinberg used

investor funds (not his own) to pay the interest on the Romanian Mortgages.  Pertinent evidence

on this point is Jaroslawicz's testimony that for two or three years, Steinberg and his family paid

the interest on the Romanian Mortgages but then they stopped paying the interest.  (Dec. 9, 2015

Hr'g Tr. at 166:24–167:4.)  Steinberg does not dispute that some investor funds, among other

funds, went towards the payment of interest on the Romanian Mortgages, testifying that the

funds for the payment of interest came from a variety of sources, including: proceeds from the

sale of an apartment (*i.e.*, Silver Mountain),[5] loans from Taub and sometimes from Jaroslawicz

and/or his investors, such as when they closed on a mortgage transaction (for the payment of

interest and bank fees).  (Dec. 8, 2015 Hr'g Tr. at 18–21.)

    5.  <u>Findings of Fact</u>

        *a.  Alleged Misrepresentation Regarding Availability of Financial
           Resources*

The Court finds that Steinberg's actions—in showing the bank statement to the Romanian

bank officer—were intended to establish a banking relationship and nothing more.  Jaroslawicz's

presence was merely incidental to that purpose.

Additionally, the Court finds that Jaroslawicz's testimony—that Steinberg led

Jaroslawicz to believe that Steinberg was going to invest the *entire* $6.5 million of proceeds from

the sale of his Manhattan residence—is not credible.  Here, Jaroslawicz, a sophisticated investor

and accomplished attorney would have no reason to believe that a $6.5 million real estate sale

would yield the seller $6.5 million in free cash flow to be invested elsewhere. Any sophisticated

investor would expect that a $6.5 million real estate sale would be subject to taxes, fees, agent's

fees and, likely, encumbrances.  In that vein, Steinberg—well acquainted with Jaroslawicz and

knowing that Jaroslawicz was a lawyer and sophisticated investor—would not have expected that

his statement that he sold his residence for $6.5 million would have induced Jaroslawicz to

believe that Steinberg would invest $6.5 million in their future venture.

---

[5]     Later, Steinberg testified that the Silver Mountain apartment was not sold, but that they got a refund of monies invested because the builder defaulted on a contract.  (Dec. 8, 2015 Hr'g Tr. at 84.)

b.   *Alleged False Representation Regarding Payment of Interest on Romanian Mortgages*

The Court credits Jaroslawicz's testimony that, at the time the Romanian Mortgages were taken out, Steinberg represented to Jaroslawicz that he would pay the interest on the Romanian Mortgages.  The Court's conclusion is buttressed by the basic equity of the situation: at the time of the first Romanian Mortgage, Jaroslawicz had taken out several personal loans from hard money lenders at high interest rates to help finance the venture, and Steinberg's payment of the interest on the Romanian Mortgages would have been fair.  Compatible with this finding, the Court credits Jaroslawicz's testimony that Steinberg and/or his family paid the interest on the Romanian Mortgages for two or three years, but then they stopped paying the interest.  (Dec. 9, 2015 Hr'g Tr. at 167:3–4.)

In support of Steinberg's supposed fraudulent intent, the Investor Plaintiffs rely on the fact that at the time of the Romanian Mortgages, Steinberg had exhausted his own personal funds.  Indeed, Steinberg testified that at the time that the Romanian Mortgages were taken out, he knew that he did not have any available funds of his own.  (*See* Dec. 8, 2015 Hr'g Tr. at 62:19–23.)  During the existence of the Romanian Mortgages, Steinberg had access to significant amounts of funds—he borrowed $1.575 million from Taub over three instances from April 2007 through December 2008.  (*See* Ex. 11 at 3 (Steinberg funding chart).)  The Court finds that despite having few funds of his own, at this particular point in time Steinberg had access to significant amounts of capital.

The record reflects that the Silver Mountain deposit went towards the payment of interest and that this occurred in August of 2009.  The Investor Plaintiffs allege, and Jaroslawicz testified, that Steinberg used the entire Silver Mountain deposit for the payment of interest.  However, Steinberg testified, and the Court credits, that the Silver Mountain deposit was taken

by the bank to pay interest on the Romanian Mortgages. (Dec. 8, 2015 Hr'g Tr. at 19:17–20:9

(Steinberg testimony).) The record establishes and the Court finds that the use of the Silver

Mountain deposit to pay interest was not the result of a *voluntary* action by Steinberg. That is,

Steinberg did not actively use the Silver Mountain deposit for the payment of interest; rather,

pursuant to the Romanian Mortgages, the Silver Mountain deposit was swept by the bank

pursuant to its first lien on receivables. (*See id.*)

      6.  <u>Analysis</u>

The Investor Plaintiffs bear the burden of demonstrating nondischarability by the

preponderance of the evidence. *In re Dobrayel*, 287 B.R. at 12. To succeed under any theory

under section 523(a)(2)(A), the Investor Plaintiffs must establish, among other things, that at the

time Steinberg made the alleged false representations or knowingly false statements, Steinberg

did so with the *intent* to deceive the Investor Plaintiffs. *See In re Giuffrida*, 302 B.R. at 123.

The Investor Plaintiffs failed to establish that, at the time of the alleged

misrepresentations or knowingly false statements, Steinberg *intended* to deceive them and, thus,

had fraudulent intent. Accordingly, the Investor Plaintiffs' section 523(a)(2)(A) claim fails and

is dismissed with prejudice.

      *a.*  *Alleged Misrepresentation Regarding Availability of Financial Resources*

With respect to Steinberg's alleged misrepresentation regarding his access to financial

resources, the Investor Plaintiffs failed to establish that Steinberg *intended* to deceive them (*i.e.*,

that Steinberg possessed fraudulent intent). In support of their contention that Steinberg

misrepresented his access to his family's wealth, the Investor Plaintiffs contend that Steinberg

brandished the Taub bank statement in Jaroslawicz's presence as an inducement for the Investor

Plaintiffs to invest in the Romanian Real Estate Venture. As the Court previously found,

Steinberg's actions were "puffery" intended to establish a banking relationship; Jaroslawicz's

presence was only incidental to that purpose.  This contention fails to prove or even support a

fraudulent intent on Steinberg's part.

In support of their contention that Steinberg misrepresented his access to his personal

wealth, the Investor Plaintiffs contend that Steinberg falsely represented the amount of proceeds

that he would be using from the sale of his Manhattan apartment to finance his share of the

venture.  This contention also fails.  The Investor Plaintiffs failed to establish Steinberg's

fraudulent intent; Jaroslawicz's testimony was not credible on this point.  Steinberg's statement

to Jaroslawicz that he sold his Manhattan residence for $6.5 million is insufficient to conclude

that Steinberg *intended* to deceive Jaroslawicz (and the other investors) that he intended to invest

the entire $6.5 million.  Furthermore, Jaroslawicz's alleged reliance (and the other Investor

Plaintiffs, by extension) on such a statement was not reasonable; any sophisticated investor

would not expect that a $6.5 million real estate sale to net $6.5 million to the seller because of

taxes, fees, agent's fees and encumbrances.  *See In re Giuffrida*, 302 B.R. at 123 (stating a

requirement of justifiable reliance for nondischargeability under section 523(a)(2)(A)).

These alleged misrepresentations and false representations regard only source and

availability of the funds for Steinberg's investment in the Romanian Real Estate Venture and,

thus, are of no moment since Steinberg and Jaroslawicz never had an agreement governing the

amount of funds they would invest (via investors or otherwise).  The evidence establishes that

Steinberg contributed over $2 million of his own funds and over $1.5 million from Taub to the

Romanian Real Estate Venture.  It is undisputed that Steinberg invested a significant amount

funds in the Romanian Real Estate Venture.  Accordingly, the Investor Plaintiffs' contention that

Steinberg misled them as to the source and breadth of his funds and access thereto is of no

moment; the parties did not establish that an agreement existed governing the amount of funds

that the parties would invest in the venture.  The Court finds that Steinberg did not make a false

representation or misrepresentation about the source or breadth of Steinberg's funds or

availability thereof, because there was never an agreement (oral or otherwise) regarding how

much the parties would invest.  The only agreement that was proven at trial to exist was that

Jaroslawicz and Steinberg were to be fifty-fifty partners.  At all relevant times, Jaroslawicz knew

he had invested substantially more than Steinberg in the property purchases.  However, that did

not slow Jaroslawicz and Steinberg down in purchasing additional properties.

> b.  *Alleged False Representation Regarding Payment of Interest on*
> *Romanian Mortgages*

The Investor Plaintiffs' claim premised on Steinberg's alleged false representations

regarding responsibility for the payment of interest on the Romanian Mortgages (until the subject

properties were sold) fails because the Investor Plaintiffs do not demonstrate the requisite

fraudulent intent by Steinberg.  To establish nondischargeability on this allegation (*i.e.*, Steinberg

knowingly made fraudulent statements that he would pay the interest on the Romanian

Mortgages), the Investor Plaintiffs must establish, among other things, that at the time that the

Romanian Mortgages were obtained, Steinberg: (i) told Jaroslawicz that he and his family would

be responsible for paying the interest on the Romanian Mortgages, and (ii) *intended* to deceive

Jaroslawicz and the rest of the Investor Plaintiffs, by extension.  Both of these contentions are the

subject of dispute.

The record does not support the contention that, at the time the Romanian Mortgages

were obtained, Steinberg had the fraudulent intent to mislead Jaroslawicz, and by extension, the

other investors.  Steinberg and/or his family paid the interest on the Romanian Mortgages for two

or three years.  This fact establishes that, at the time that Romanian Mortgages were obtained on

the subject properties, Steinberg did not mislead Jaroslawicz into believing that he would pay the interest because Steinberg *did* pay the interest for two or three years thereafter. Thus, Steinberg's payment of interest on the Romanian Mortgages for two or three years eviscerates the Investor Plaintiffs' false representation allegation.

Next, the Investor Plaintiffs contend that Steinberg fraudulently intended to defraud the Investor Plaintiffs when the Romanian Mortgages were obtained because, at that time, he had no funds of his own to pay the interest he said he would pay. The evidence does not support the Investor Plaintiffs' contention; it is undercut by Steinberg's access to funds from his father-in-law at that point. During the existence of the Romanian Mortgages, Steinberg had access to significant amounts of capital, as he borrowed $1.575 million from Taub over three instances from April 2007 through December 2008. (*See* Ex. 11 at 3 (Steinberg funding chart).)

The Investor Plaintiffs argument that the €298,000 Silver Mountain deposit was used to pay interest on the Romanian Mortgages fails to establish Steinberg's fraudulent intent. Jaroslawicz testified—and the Court credits—that Steinberg and his family paid the interest on the Romanian Mortgages for two or three years. (Dec 9, 2015 Hr'g Tr. at 167:3–4.) The Silver Mountain deposit was used to pay interest in August of 2009, long after the Romanian Mortgages were obtained. Moreover, application of the Silver Mountain deposit to pay interest was not the result of a *voluntary* action by Steinberg; the bank swept the funds because of the unpaid interest.

The Investor Plaintiffs also failed to prove that Steinberg's alleged promise to Jaroslawicz to be responsible for the interest on the Romanian Mortgages established an obligation on his part to pay the interest on the Romanian Mortgages rather than to have the payments taken out of his distributions (in the event the properties were sold). Frankly, the

23

entire Romanian Real Estate Venture was rife with ambiguity and handshake deals; the Court

will not allow the Investor Plaintiffs' attempt now, several years later, to impose

nondischargeable liability on Steinberg from a risky business venture gone awry.

### B.    Claim Pursuant to 11 U.S.C. § 523 (a)(4) – Embezzlement

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt incurred as a

result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

The phrase "while acting in a fiduciary capacity" only qualifies the words "fraud or defalcation"

and not "embezzlement" or "larceny"; the implication is that the discharge exception applies

even when the embezzlement or larceny was committed by someone not acting as a fiduciary.  4

COLLIER ON BANKRUPTCY ¶ 523.10 (15th ed. 2006).  Embezzlement for purposes of section

523(a)(4) is defined by reference to federal common law, which defines it as the fraudulent

appropriation of money by a person to whom such property has been entrusted or into whose

hands it has lawfully come.  *Moonan v. Bevilacqua (In re Bevilacqua)*, 53 B.R. 331 (Bankr.

S.D.N.Y. 1985).

Embezzlement requires a showing that (1) the debtor rightfully possessed another's

property, (2) the debtor appropriated the property for use other than the use for which the

property was entrusted, and (3) the circumstances implied a fraudulent intent.  *Munoz v. Boyard*

*(In re Boyard)*, 538 B.R. 645, 654 (Bankr. E.D.N.Y. 2015).  A partner or employee who diverts a

corporation's funds for his own use commits embezzlement within the meaning of section

523(a)(4).  *Id.*  The burden of proof under section 523 is on the moving party by a preponderance

of the evidence.  *Curtis Lumber Co., Inc.  v. Waldron (In re Waldron)*, No. 13-12190, 2015 WL

6734481, at *4 (Bankr. N.D.N.Y. Nov. 3, 2015) (citing *Grogan v. Garner*, 498 U.S. 279 (1991)).

1.  <u>Parties' Contentions</u>

In support of the Investor Plaintiffs' claim under section 523(a)(4), the Investor Plaintiffs

allege that Steinberg used investment funds for several improper purposes, including making

interest payments that Steinberg was obligated to make from his personal finances.  Additionally,

the Investor Plaintiffs allege that Steinberg misappropriated and/or cannot account for invested

funds.  Specifically, the Investor Plaintiffs allege the following:

*Cluj Funding*: the Investor Plaintiffs allege that one investor, Malekan, provided

Steinberg with approximately $690,000 for the acquisition of a Romanian property in Cluj.

(Pretrial Order at 7.)  According to the Investor Plaintiffs, half of the $690,000 was a loan and

the other half was an investment.  (*Id.*; Dec. 9, 2015 Hr'g Tr. at 16:16–17:4.)  Steinberg

assembled several other properties in Cluj to form one large parcel (the "Cluj Property").

(Pretrial Order at 7.)  Steinberg collected $1.5 million from a buyer who defaulted on the

purchase of the Cluj Property, but Steinberg only returned approximately $345,000 loan portion

to Malekan.  (*Id.*)  Further, the Investor Plaintiffs allege that Steinberg used $500,000 of the $1.5

million forfeited deposit to make interest payments on the Romanian Mortgages instead of using

his own funds.  (*Id.*)  Additionally, the Investor Plaintiffs allege that Steinberg then gave the

remaining $1 million to an entity as partial repayment on a $1.8 million loan.  (*Id.*)  The Investor

Plaintiffs contend that Malekan never agreed for his contribution to be used to make interest

payments and he was entitled to receive his share from the $1.5 million Cluj paid by the buyer.

(*Id.*)

*Lake Brasov Funding*: the Investor Plaintiffs allege that two investors provided Steinberg

with a total of approximately $675,000 to purchase a Romanian property near a lake in Brasov.

(*Id.*)  The Investor Plaintiffs allege that Steinberg never purchased the property.  (*Id.*)  Moreover,

according to the Investor Plaintiffs, Steinberg did not return any of the funds to the investors and cannot account for the funds.  (*Id.*)

*Vladarean Stolen Funds*: the Investor Plaintiffs assert that, starting in 2010, Steinberg claimed that a man named Adrian Vladarean stole €345,330 of the investors' funds in 2006.  (*Id.* 13.)  The Investor Plaintiffs contend that the Defendant has not provided the Investor Plaintiffs with documentation to verify this claim.  (*Id.*)

*Improper Use of Investment Funds*: the Investor Plaintiffs argue that Steinberg used investment funds to pay for the interest payments on the mortgages on the Romanian properties. (*Id.* at 8.)  They contend that the interest payments on the mortgages were Steinberg's sole responsibility and thus it was improper to use investment funds to make those payments. Moreover, the Investor Plaintiffs claim that Steinberg made interest payments using a €298,000 deposit that was returned to him in connection with a Romanian property located in Silver Mountain.  (*Id.* at 8.)

Steinberg responds that he never fraudulently appropriated property of the investors.  (*Id.* at 18.)  He contends that monies funneled through Jaroslawicz by his clients and friends were applied consistent with Steinberg's authority, and Jaroslawicz's ratification of Steinberg's management of the Romusa LLCs (*id.*); Steinberg borrowed $1,500,000 from his father-in-law (*see* Ex. 11); Steinberg's wife paid his personal living expenses in Romania from at least 2009 through 2013 (*see* Dec. 8, 2015 *see* Hr'g Tr. at 39:14–25 (Chana Steinberg testimony)); Steinberg invested over $2,000,000 of his own funds (s*ee* Ex. 3); Steinberg incurred over $75,000 in personal credit card debt traveling to Romania for business reasons (Def. FoF at 39); Steinberg's personal accounts at Marfin Bank were set up on the advice of bank representatives to facilitate transfers into the Romusa LLC accounts at the same bank; and Jaroslawicz consented

to the arrangement and knowingly transferred all monies to Steinberg's Marfin accounts and the

bank statements on those accounts show such monies being transferred into the Romusa LLCs'

accounts.  (Pretrial Order at 18.)

Additionally, Steinberg also argues that he used funds openly, without concealment, and

there was no operating agreement for the Romusa LLCs prohibiting or restricting the use of

funds for business expenses.  (Def. FoF at 39.)

    2.  <u>Findings of Fact</u>

*a.  Cluj Funding*

There is a glaring internal inconsistency in the Investor Plaintiffs' allegations and

evidence introduced at trial with respect to the Cluj funding.[6]  The Investor Plaintiffs allege,

among other things, that Steinberg used $1 million of the €1.5 million deposit that was forfeited

by the buyer to repay "an entity as partial repayment on a $1.8 million loan."  (Pretrial Order at

7.)  Jaroslawicz testified that, after the potential Cluj buyer defaulted and the €1.8 million deposit

was forfeited to the venture, he insisted that Steinberg send $1 million to Spring Farm, a hard

money lender from whom Jaroslawicz had borrowed $1.785 million at a high interest rate.  (Dec.

9, 2015 Hr'g Tr. at 27:14–28:3 (Jaroslawicz testifying that "[a]nd then when we got some money

back from a deposit in [C]luj I insisted that [Steinberg] send some back to Spring Farm because I

was on the hook for that money.  [Steinberg] finally sent over a million dollars").)  The Court

---

[6]      The Court also notes the internal inconsistencies within the Investor Plaintiffs' allegations in the Pretrial Order: the Investor Plaintiffs allege that Steinberg received a $1.5 million deposit from the defaulted buyer and (i) used $1 million to repay an entity as a partial repayment of a $1.8 million loan, (ii) returned the $345,330 loan portion to Malekan, and (iii) impermissibly used $500,000 to make an interest payment on the Romanian Mortgages. (Pretrial Order at 7.)  These amounts Jaroslawicz total $1.845 million, more than the amount the Investor Plaintiffs allege that Steinberg received.  At trial, however, the Investor Plaintiffs attempted to modify their allegations to allege that Steinberg €1.5 million.

finds that Steinberg was acting pursuant to his Jaroslawicz's instructions to send part of the forfeited Cluj deposit to Spring Farm.[7]

Further, the Investor Plaintiffs allege that Malekan invested in the Cluj Property and was due a return of his capital from the buyer's €1.5 million forfeited deposit. However, Jaroslawicz undercut this position when testified that the buyer's default for a property in Cluj (in 2008) was "[n]ot Malekan's Cluj, but for the other Cluj properties" which they had bought and that the buyer was supposed to pay $12 million. (Dec. 9, 2015 Hr'g Tr. at 27:24–28:3.) There is no evidence in the record of any other buyer default for a property in Cluj that resulted in a €1.5 million forfeited deposit. Jaroslawicz testified that he struck the deal with Malekan and further testified that Steinberg was aware of such arrangements. Steinberg testified that he only knew of Malekan after Malekan sent him an email introducing himself in 2010. (Dec. 7, 2015 Hr'g Tr. at 194:8–15.) Given the discrepancies in the Investor Plaintiffs' allegations and Jaroslawicz's testimony, and the fact that Steinberg and Jaroslawicz had agreed to be fifty-fifty partners, the Court does not find Jaroslawicz's testimony credible on the Cluj investments and the surrounding circumstances.

The Investor Plaintiffs contended that Steinberg used $500,000 of the defaulted Cluj deposit to pay interest on one of the Romanian Mortgages when it was Steinberg's responsibility to make the payment out of his own funds (*i.e.*, not use investor funds). The Court finds that the $500,000 was used to repay a portion of the principal on the Romanian Mortgages (*see* Ex. 3).

---

[7]    At closing arguments, Investor Plaintiffs' counsel attempted to argue that there were discrepancies due to the exchange rate between the American Dollar and the Euro which produced a several hundred thousand dollar ($253,731) differential that is unaccounted for. (*See generally* Feb. 5, 2016 Hr'g Tr. at 38–42.) Since the Investor Plaintiffs failed to include these allegations in the Pretrial Order, the Court need not consider them. (*See* Pretrial Order at 4 (providing that the pleadings "are deemed amended to embrace the following, and *only the following*, contentions of the parties" (emphasis added)).) However, notwithstanding the foregoing, the Court notes that the alleged missing differential, according to the Investor Plaintiffs' own contentions, could more than be accounted for by the $345,330 return of capital to Malekan. (*See id.* at 7.)

Moreover, the Court finds that defaulted Cluj deposit was *revenue*.  Steinberg was entitled to

direct such funds towards the payment of principal (or interest) on a Romanian Mortgage, as

Jaroslawicz and Steinberg were fifty-fifty partners; Steinberg was entitled to 50% of the revenue.

Given the inconsistencies in Jaroslawicz's testimony on this issue, and given the seemingly

incompatibility of the multiple and complex side-investments that Jaroslawicz solicited, the

Court does not credit Jaroslawicz's testimony that Malekan's and Freund's deals (or any other

third-party investor's deal) trumped the fifty-fifty split of profits initially agreed upon by

Steinberg and Jaroslawicz.

### b.  *Lake Brasov Funding and Vladarean Stolen Funds*

The Investor Plaintiffs allege that "two investors" provided a total of $675,000 for the

purchase of certain properties in Romanian by the lake in Brasov, but the property was never

purchased and Steinberg failed to return the funds to the investors.  (Pretrial Order at 7.)

Additionally, with respect to Steinberg's testimony that Vladarean stole €345,330 in 2006, the

Investor Plaintiffs allege that Steinberg failed to produce any documentation demonstrating that

the funds were provided to Vladarean.  (*Id.* at 13.)  Jaroslawicz testified that Vladarean stole

$675,000 in cash.  (Dec. 9, 2015 Hr'g Tr. at 17:11–18:1.)  Steinberg testified that he pursued

Vladarean through civil means in Romania for the missing funds and convinced Vladarean to

sign "executive titles" whereby Vladarean assumed responsibility plus additional penalties.

(Dec. 8, 2015 Hr'g Tr. at 253:4–15.)  Steinberg further testified that he hired Kruk International,

a collection agency, to recover against Vladarean.  (*Id.* at 254:2–10; *see* Ex. CC (contract with

Kruk).)

Jaroslawicz's trial testimony about Vladarean was inconsistent; he testified that

Vladarean stole $675,000 in 2008, without mentioning the alleged €345,330 that Vladarean stole

in 2006.  The Court finds that Jaroslawicz's testimony about Vladarean was not credible.  The

Court credits Steinberg's testimony that he pursued Vladarean for the stolen €345,330 through civil means in Romania, as well as by the hiring of the collection agency.

### c.   Improper Use of Investment Funds

The Investor Plaintiffs allege that Steinberg used investment funds to pay interest, including the $500,000 of the forfeited Cluj deposit and the €298,000 Silver Mountain deposit. The Court finds that Steinberg did not misuse these funds.  Steinberg was permitted to direct the use of the forfeited Cluj deposit to payment of principal or interest on the Romanian Mortgages; the Silver Mountain deposit was swept by the bank, not voluntarily used by Steinberg.

### 3.   Analysis

As detailed below, the Court concludes that the Investor Plaintiffs failed to carry their burden to establish that Steinberg embezzled funds.  Accordingly, the Investor Plaintiffs' section 523(a)(4) claim fails and is dismissed with prejudice.

### a.   Cluj Funding

In light of the finding that Steinberg was entitled to use the $500,000 forfeited Cluj deposit, there is no embezzlement on the basis of this transaction.  Steinberg was entitled to direct such funds towards the payment of principal or interest on the Romanian Mortgages. Jaroslawicz and Steinberg were equal partners; Steinberg was entitled to his share of the revenue. Therefore, the Investor Plaintiffs fail to establish embezzlement based on the Cluj funding.

### b.   Brasov Funding and Vladarean Stolen Funds

The Court concludes that the Investor Plaintiffs failed to establish that Steinberg embezzled $675,000 connected to the Brazov funding.  As detailed above, the Court finds that the Investor Plaintiffs' version of events lacks credibility given the numerous inconsistencies. Additionally, the Court finds that Steinberg did not embezzle the €345,330 of the investors' funds in 2006.  Steinberg testified credibly that he pursed Vladarean through civil means in

Romania, as well as enlisting a collection agency to pursue Vladarean.  Accordingly, the Investor

Plaintiffs fail to carry their burden to establish that Steinberg embezzled the funds.

*c.  Improper Use of Investment Funds*

As detailed above, Steinberg was entitled to use the $500,000 of the forfeited Cluj

deposit; therefore, there can be no embezzlement on the basis of this transaction.  With respect to

Steinberg's alleged use of the €298,000 Silver Mountain deposit, those funds were swept by the

bank.  Steinberg did not misuse the funds.  Therefore, the Investor Plaintiffs fail to establish that

Steinberg improperly used or embezzled investor funds.

### C.    Claim Pursuant to 11 U.S.C. § 523 (a)(6) – Willful and Malicious Injury

The Plaintiffs failed to assert this claim in the Pretrial Order.  At the hearing, the

Plaintiffs agreed that count three was dismissed.  Accordingly, the claim is dismissed with

prejudice.

### D.    Claims Pursuant to 11 U.S.C. § 727(a)(2)(A) – Fraudulent Transfer & Concealment of Property

Bankruptcy Code section 727(a)(2) prohibits a court from granting a debtor a discharge

if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an
> officer of the estate charged with custody of property under this
> title, has transferred, removed, destroyed, mutilated, or concealed,
> or has permitted to be transferred, removed, destroyed, mutilated,
> or concealed –
>
> > (A) property of the debtor, within one year before
> > the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A).  To establish a claim under section 727(a)(2) of the Bankruptcy Code,

the objecting party must show that the act:

- consisted of transferring, removing, destroying or concealing any of the debtor's
  property, or permitting any of these acts to be done;

- was done with actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;
- was that of the debtor or a duly authorized agent of the debtor; and
- complained of was done within the one year before the date of the filing of the petition (unless the act operates as a continuing concealment).

*See* 11 U.S.C. § 727(a)(2).  Discharge will be precluded under section 727(a)(2) if all of the

above prongs are proven by a preponderance of the evidence.   *See Grogan v. Garner,* 498 U.S.

279, 290–91 (1991).  The statute applies to acts involving either concealment of a debtor's

property or transfers of that property.  *In re Kontrick*, 295 F.3d 724, 735–37 (7th Cir. 2002)

(stating that "§ 727(a)(2)(A) [or (B)] essentially consists of two components: an act (*i.e.*, a

transfer or concealment of property) . . . " (internal citations omitted)).  By the unambiguous text

of the statute, concealment alone is sufficient under this subsection.  *Rosen v. Bezner*, 996 F.2d

1527, 1532 (3d Cir.1993) ("What is critical under the concealment provision of § 727(a) is

whether there is a concealment of *property*, not whether there is concealment of a transfer."

(emphasis in original)); *see also Portnoy v. Marine Midland Bank (In re Portnoy)*, 201 B.R. 685,

694–95 (Bankr. S.D.N.Y. 1996) (stating that a failure to volunteer is inadequate for concealment

but concealment is evidenced when a debtor withholds knowledge or refuses to divulge

information because there is a "duty to tell" once a debtor begins to set forth the facts

surrounding a subject).  Courts have recognized that the one-year limitation associated with

denial of discharge under this provision can be extended by the continuing concealment doctrine.

*Doubet v. Palermo (In re Palermo)*, 370 B.R. 599, 612 (Bankr. S.D.N.Y. 2007).

Fraudulent intent may be inferred by circumstantial evidence or inferences drawn from a

course of conduct.  *In re Handel*, 266 B.R. 585, 588–89 (Bankr. S.D.N.Y. 2001).  The badges of

fraud often cited as circumstantial evidence of intent are (i) lack or inadequacy of consideration,

(ii) a family, friendship, or close associated relationship between the parties; (iii) the retention of

position, benefit, or use of the property in question; (iv) the financial condition of the party

sought to be charged both before and after the transaction in question; (v) the existence or

cumulative effect of a pattern or series of transactions or course of conduct after incurring of

debt, onset of financial difficulties, or pendency of suit by creditors; and (vi) the general

chronology of the events and transaction.  *Id.* at 589.

      1.  <u>Fraudulent Transfer</u>

      *a.  Parties' Contentions*

The Plaintiffs argue that Steinberg transferred a carry forward loss, based on his losses in

Romania, to his wife, Chana Steinberg.  (Pls. FoF at 17.)  In support of this argument the

Plaintiffs point to an email exchange between Steinberg's accountants, discussing transferring

the carry-forward loss to Chana Steinberg, in connection with Chana Steinberg and Steinberg's

2014 tax return.[8]  (*Id.* (citing Ex. 28 (BC000032).)  In the email exchange, Richard Wright

indicated that Steinberg needed a determination as to "how to use his losses in Romania."  (Ex.

28.)  In response, Steinberg argues that the Plaintiffs failed to identify any "asset" that he

allegedly concealed.

      *b.  Analysis*

The Plaintiffs failed to demonstrate by a preponderance of the evidence that Steinberg is

not entitled to discharge pursuant to section 727(a)(2).  The Plaintiffs have not established that

Steinberg transferred a carry forward loss to his wife.  The Plaintiffs point to an email exchange

between Steinberg's accountants discussing the viability of Steinberg transferring the carry

forward loss to his wife.  The email exchange is not in evidence, as the Plaintiffs failed to

---

[8]     Plaintiffs' Exhibit 28 was never introduced into evidence.  Therefore, the Court did not consider it.  The discussion regarding the exhibit is included in this Opinion for the purpose of providing context regarding the circumstances that gave raise to this assertion.

introduce it at trial.  In fact, even if the email exchange was in evidence, it does not *prove* that

Steinberg actually transferred the carry forward loss to his wife.

Steinberg's 2014 joint tax return, which is in evidence, contains no carry-forward loss.

(*See* Ex. 129.)  The Plaintiffs failed to point to a specific form, or section, of Steinberg's 2014

joint tax return that proves that Steinberg transferred a carry forward loss to his wife.  Rather, it

only shows that there was a long-term capital loss carryover to 2015.

Even if the Court were to assume that Steinberg transferred a carry forward loss in 2014

to his wife, the Plaintiffs fail to carry their burden of proving that transfer was the done with

actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody

of property under the Bankruptcy Code.  Accordingly, the Plaintiffs' section 727(a)(2) claim, as

it relates to the Plaintiffs' fourth cause of action for fraudulent transfer, fails and is dismissed

with prejudice.

### 2.    Claim Pursuant to 11 U.S.C. § 727(a)(2) – Concealment of Property

In the Complaint, the Plaintiffs allege, as their fifth cause of action, that Steinberg

"wrongfully diverted and transferred such payments to his wife, Chana Steinberg, his father-in-

law, Israel Taub, or an unknown person or entity in a transparent attempt to place his assets

outside the reach of Plaintiffs."  (Compl. ¶ 77.)  However, the Plaintiffs failed to raise this cause

of action in either their proposed findings of fact or their memorandum of law.  Moreover, there

is no evidence in the record supporting the Plaintiffs' fifth cause of action.  Accordingly, the

Plaintiffs' section 727(a)(2) claim, as it relates to the Plaintiffs' fifth cause of action for

concealment of property, fails.

### E.    Claim Pursuant to 11 U.S.C. § 727(a)(3) – Failure to Keep Records

Bankruptcy Code section 727(a)(3) provides that the court may deny a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed
> to keep or preserve any recorded information, including books,
> documents, records, and papers, from which the debtor's financial
> condition or business transactions might be ascertained, unless
> such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).  To plead and prove a failure to keep or preserve books or records under

this section, the movant must show (1) that the debtor has failed to keep or preserve books or

records; and (2) that the debtor's financial condition or business transactions might have been

ascertained from those books or records.  If these two elements are satisfied, the debtor may

respond by showing that the act or failure to act is justified by the circumstances of the case.

While a debtor has a duty to keep or preserve books and records sufficient to "to enable

the court and the parties to reasonably ascertain an accurate picture of his financial affairs,"

*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 355 (4th Cir. 2007), there are

instances where a debtor has no duty to preserve books.  For instance, a consumer debtor may

not have an obligation to keep books, but a debtor who is a sophisticated business person "will

be held to a higher level of accountability in record keeping."  6 COLLIER ON BANKRUPTCY ¶

727.03[3][b] (citing *Meridian Bank v. Alten*, 958 F.2d 1226, (3d Cir. 1992)).  "If the nature and

extent of the debtor's transactions were such that others in like circumstances would ordinarily

keep financial records, the debtor must show that because of unusual circumstances there was no

duty to keep them."  *Id.* (citing *In re Sandow*, 151 F.2d 807 (2d Cir. 1945)).

If a debtor has a duty to preserve his books and records, he must preserve all records that

would be material to a proper understanding of his financial condition.  This includes "books of a

partnership or corporation, . . . bank books, check, check stubs or other business papers" if they

are "necessary to proper[ly] understand[] the debtor's financial condition and business

transactions." *Id.* (citing *In re Esposito*, 44 B.R. 817 (Bankr. S.D.N.Y. 1984); *Tucker v. Devine (In re Devine)*, 11 B.R. 487 (Bankr. D. Mass. 1981)).

Under section 727(a)(3), after the objecting party has established its prima facie case by showing the records are insufficient "to ascertain the debtor's financial condition and business transactions, then the burden of coming forward shifts to the debtor to produce additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records." *In re Nemes*, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005) (internal citations and quotations omitted).

1. <u>Parties' Contentions</u>

The Plaintiffs argue that Steinberg obstructed their ability to fully assess Steinberg's financial condition because Steinberg does not have access to the business records for the Romanian Real Estate Venture. (Pls. FoF at 3.) Steinberg admits that he turned over the original "accounting files" for the venture to a Romanian judicial administrator, Liliana Andreea Ciurea, in 2013 when he filed the insolvency proceedings on behalf of the Romusa LLCs. (*Id.* at 2.) The Plaintiffs argue that Steinberg's failure to maintain copies of the business records for the Romanian Real Estate Venture warrant a denial of discharge because Steinberg has obstructed the Plaintiffs' ability to fully assess his financial condition. (*Id.*) Moreover, the Plaintiffs argue that Steinberg (i) failed to provide the Plaintiffs with the address where such records were kept, (ii) failed to turn over such records to a lawyer, and (iii) failed to produce any evidence demonstrating that he turned over such records to the Romanian judicial administrator. (*Id.* at 2–3.)

In response, Steinberg argues that the Plaintiffs have failed to establish how the records of the Romanian Real Estate Venture pertain to his financial condition and his ability to pay his creditors. (Pretrial Order at 20.) Steinberg argues that the Plaintiffs ignore the fact that he has

produced eight years of joint tax returns, bank account statements, and credit card statements that

enable the Plaintiffs to ascertain his financial condition.  (*Id.*)  Among other things, Steinberg

contends that he has provided the following documents to the Plaintiffs:

- domestic banking statements with his wife from HSBC Bank from 2006–2013;
- contact information of his former counsel who conducted the closing the sale of Steinberg's residence in July 2005;
- credit card statements from 2006–2013;
- loan history summaries, promissory notes, creditor pledge agreements and facsimiles of a certificate of deposit held by HSBC bank of Steinberg's former company "SSII," whose credit line Steinberg used to fund approximately $2,000,000 of investments made to the Romanian limited liability companies from 2006–2007; and
- bank account statements from Marfin Bank of Romania on the accounts of each of the Romanian limited liability companies, from 2006–2011

(Def. FoF at 47.)

    2.  Analysis

The Plaintiffs do not allege deficiencies in the documentation that Steinberg provided

them concerning his financial condition.  In that vein, they have not demonstrated that the

information produced by Steinberg is insufficient to accurately access his financial condition.

Instead, they allege that the documents pertaining to the Romanian Real Estate Venture are

necessary to accurately access Steinberg's financial condition.  However, the Plaintiffs have

failed to demonstrate how extensive documentation of the Romanian Romusa LLCs is related to

Steinberg's (as the Debtor) financial condition.  The Plaintiffs have failed to carry their burden

that Steinberg is not entitled to discharge under section 727(a)(3) of the Bankruptcy Code and

the claim is dismissed with prejudice.

**F.  Claim Pursuant to 11 U.S.C. § 727(a)(4)(A) – False Oaths**

A denial of discharge under section 727(a)(4)(A) requires the objecting party to plead and

prove the following elements:

    (i)  material false oath

(ii) knowingly and fraudulently made

(iii) in connection with a bankruptcy case.

*Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008).  The false oaths

recognized under this subsection could have been made in schedules, statement of affairs, or

statements during examinations.  *FL Receivables Trust 2002 v. Fernandez* (*In re Fernandez*),

2008 WL 268975 (Bankr. D. Conn. Jan. 29, 2008); 6 COLLIERS ON BANKRUPTCY ¶ 727.06–07

(15th ed. rev. 2008).  Omissions from the debtor's schedules are equally recognized as

generating liability under this subsection.  *In re Handel*, 266 B.R. at 590.

A discharge should only be denied under this section when the false oath has been

knowingly and fraudulently made.  To determine whether the oath has been knowingly and

fraudulently made, the same analysis applicable to an objection to discharge pursuant to section

727(a)(2) is applicable.  The scope of section 727(a)(4)(A) is broader, however, with respect to

the "objects of the debtor's fraudulent intent."  6 COLLIERS ON BANKRUPTCY ¶ 727.04 (15th ed.

rev. 2008).  Further, the intent "may be discovered by inference from the facts."  *Id.*  "Statements

called for in the schedules, or made under oath in the answer to questions propounded during the

bankrupt's examination or otherwise, must be regarded as serious business; reckless indifference

to the truth . . . is the equivalent of fraud."  *Diorio v. Kreisler-Borg Constr. Co. (In re Diorio)*,

407 F.2d 1330, 1331 (2d Cir. 1969) (per curiam); *see also In re Chavin*, 150 F.3d 726 (7th Cir.

1998) (finding that the debtor's answers were so implausible that they justified summary

judgment denying discharge); *Boroff v. Tully (In re Tully)*, 818 F.2d 106 (1st Cir. 1987)

(concluding that reckless indifference to truth is equivalent to fraud).

"The false oath that is a sufficient ground for denying a discharge may consist of (1) a

false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an

examination during the course of the proceedings."  6 COLLIER ON BANKRUPTCY ¶ 727.04[c]

(citing cases).  "This includes statements made by the debtor when being examined at creditors' meetings . . . ."  *Id.*  (citing cases).

Materiality is found if the false oath is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property.  6 COLLIERS ON BANKRUPTCY at ¶ 727.06–07.  According to Collier's, "a debtor who, without fraud, fails to schedule property of no value is not guilty of making a false and fraudulent oath.  Thus when the debtor omits securities that are absolutely worthless, a discharge will not be refused.  Omission of property of trivial value sometimes has been treated as immaterial."  COLLIER ON BANKRUPTCY ¶ 727.04[2] (internal citations omitted).  Omissions are material if they impact the trustee's ability to discover other assets, fully investigate pre-bankruptcy dealings, financial condition, and discovery of preference or avoidance actions.  *Id.* The analysis of what constitutes intent to defraud is the same as used in evaluating claims under § 727(a)(2).  *Id.*  Intent under this section can be found based on a reckless disregard, but will not be found in cases of ignorance or carelessness.  *Id.*

Once the objecting creditor has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanations.  *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005) (applying the shifting burden); *Micro Connections, Inc. v. Shah (In re Shah),* 2008 WL 117860, *37 (Bankr. E.D.N.Y. Jan. 10, 2008) (citing *In re Murray*, 249 B.R. 223, 228 (E.D.N.Y. 2000)).

### 1.   Parties' Contentions

The Plaintiffs allege that Steinberg (i) admitted during his deposition that he failed to disclose, on his bankruptcy schedules, a lease on a Romanian apartment that he maintains; (ii) failed to disclose that he had a personal bank account, and (iii) presented false testimony at his

deposition with respect to the claim that he never represented that he would be responsible for

making the interest payments on the mortgages.  (Pls. FoF at 18.)

In response to this count, Steinberg points to the factual allegations set forth in

Complaint, which stated the following:

> based on the family's purported income, Debtor and his wife
> manage to live a lavish lifestyle in a large Manhattan apartment,
> maintain a car in the City, take expensive vacations, pay the
> tuition, room and board for their two children who currently attend
> NYU and the University of Michigan. Based on their lifestyle,
> Debtor and his wife have other sources of income and/or assets
> that he fails to disclose in the Schedules.

(Def. FoF at 49 (citing Compl. ¶ 50).)  In his response, Steinberg argues that he provided the

Plaintiffs with evidence that the source of the family's income since has been the earnings and

income of Steinberg's wife.  (*Id.*)  Steinberg's wife is a literary agent and property manager for

three limited liability companies.  (*Id.*)  In addition, Steinberg points to the fact that he has

introduced joint tax returns from 2006 through 2013.  (*See* Exs. II, SS, RR, QQ, PP, OO, NN,

MM.)  Steinberg claims that each tax return shows no earned or business income by him.

Specifically, Steinberg indicates that his tax returns from 2005 through 2013 reflect that he

earned zero wages, salary or tips for the last eight years.  (Def. FoF at 51.)  Instead, the tax

returns show that all income is derived from Steinberg's wife, Chana Steinberg.  (*Id.* at 50.)

With respect to the apartment lease allegation, Steinberg argues that the lease at issue was

a hold-over tenancy on an expired lease.  (Def. Mem. of Law at 26.)

With respect to the bank account, Steinberg argues that the Plaintiffs' allegation that he

failed to disclose the account on schedules is patently false.  (*Id.* at 27.)  Steinberg contends that

the bank account is listed on statement of financial affairs under "closed financial accounts."  (*Id.*

(citing Ex. UU).)  Specifically, the account is listed as having been closed in May 2014 with a

zero balance.  (*Id.*)  Moreover, Steinberg contends on May 13, 2014, before leaving Romania to

return to New York to file his bankruptcy schedules, he went to his bank branch and closed his

personal account and subaccounts.  (Def. FoF at 55.)  When the account was closed, the balance

in his U.S. currency account was $5.00; there was a zero balance in his Euro account and his

Euro savings and RON accounts had balances of zero.  (*Id.* (citing Ex. XX).)  Steinberg contends

that the remaining RON account contained funds valued at 14,497.52 RON as of May 13, 2014,

which would be $4,498.48 at the relevant conversion rate.  (*Id.*)  Steinberg contends that he

withdrew and retained control of those funds for his living expenses.  (*Id.*)  Accordingly,

Steinberg contends that his bankruptcy schedules should have reflected a total cash balance of

$4,603.58 (which would have included the $4,498.48 in RON/dollars, the $5.00 U.S.D., and

$100 cash at hand).  (*Id.*)  Steinberg argues that the omitted cash balance falls within the

"wildcard" exemptions cap amount.  (*Id.*)

Steinberg argues that omission was immaterial, especially in light of the fact that the

scheduled debt in the bankruptcy is $18,158,080.82 against assets originally scheduled in the

sum of $11,949.00.  (*Id.* at 56.)  Moreover, the balance was utilized for Defendant's living

expenses and falls within his statutory exemption.  (*Id.* at 56.)  Additionally, Steinberg contends

that schedules have since been amended to accurately reflect this sum.  (*Id.*)

2.  Analysis

With respect to the Plaintiffs' first argument—regarding Steinberg's alleged failure to

disclose a lease on a Romanian apartment—the Plaintiffs have failed to prove that this omission

was material or fraudulently made.  The lease at issue was a hold-over tenancy on an expired

lease that likely had no value to the estate.  The omission of the lease was immaterial and does

not warrant a denial of discharge.

With respect to the Plaintiffs' second argument—regarding Steinberg's alleged failure to disclose a personal bank account—Steinberg has demonstrated that he disclosed the bank account on his statement of financial affairs. Despite the fact that Steinberg failed to disclose the cash that was withdrawn from the account on his schedules, the omission is immaterial in this case. The amount of cash—$4,498.48—is trivial as compared to the alleged claim that exceeds $16 million.

With respect to the Plaintiffs' third argument—concerning the allegation that Steinberg presented false testimony at his deposition regarding the mortgage interest payments—the Plaintiffs failed to introduce Steinberg's deposition transcript into evidence at trial. Accordingly, the Plaintiffs have failed to meet their burden to prove that Steinberg presented false testimony at his deposition regarding the mortgage interest payments. In any event, it is unlikely that such testimony would constitute a material false oath that would warrant a general denial of discharge. This claim fails and is dismissed with prejudice.

## G.      Defendant's Counterclaim

"When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 491 (1989) (internal citations omitted). Under New York law, an agreement by a party to a contract to indemnify the other for attorney's fees incurred in litigation between them must be "unmistakably clear from the language of the promise," or else it must be manifest from the surrounding facts and circumstances or purpose of the agreement. *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999) (quoting *Hooper Assocs.*, 74 N.Y.2d at 492) (internal citations omitted).

1.  Defendant's Contentions

Steinberg's counterclaim seeks a judgment for indemnification against Jaroslawicz

alleging that (1) in the course of multiple loans secured by the Romanian limited liability

companies under Jaroslawicz's consent, Jaroslawicz executed powers of attorney to Steinberg

(Ex. C-sub(f) "Apostille and Power of Attorney dated March 16, 2007" (Bates Nos. 983–984),

sub(c) "Apostille and Power of Attorney dated May 16, 2008" (Bates Nos. 1017–1019)); (2)

Jaroslawicz's May 16, 2008 power of attorney conveyed authority to Steinberg to, among other

things "decide freely upon the terms and conditions of said operations . . . ."; (3) Steinberg was

guaranteed that he would be "exonerated of any liability for any losses and damages arising from

or in connection with the present power of attorney"; and (4) Steinberg's May 2008 power of

attorney was never revoked.  (Def. FoF at 57.)

Further, Steinberg notes that his wife, Chana Steinberg, paid for his attorneys' fees and

costs associated with the liabilities that Steinberg incurred, and thus, Chana could be equitably

subrogated to Steinberg's right under the power of attorney to claim collection of the loans and

costs incurred.  (*Id.* at 59.)

In response, the Plaintiffs contend that there is no clause in the May 2008 power of

attorney signed by Jaroslawicz that would obligate Jaroslawicz to pay for any attorneys' fees

resulting from litigation between Jaroslawicz and Steinberg.  (Pls. FoF at 19.)  That power of

attorney only provides, in relevant part:

> Whereas the empowered person is acting in my name, on my
> behalf and for my benefit, I hereby ratify whatever my attorney
> will do or have to do in the limits of the law and of the present
> power of attorney.  I hereby guarantee that my attorneys will be
> exonerated of any liability or any losses and damages that may
> occur, arising from or in connection with fulfilling the present
> power of attorney.

(*Id.* at 20 (citing Ex. 120 (1019)).)

The Plaintiffs contend that the parties never intended that Jaroslawicz would be indemnifying Steinberg for a lawsuit for damages caused by, among other things, the fraudulent acts committed by Steinberg against Jaroslawicz and the other plaintiffs. (*Id.*) Further, the Plaintiffs note that Steinberg has not paid his legal fees, Steinberg's wife is paying for Steinberg's attorneys, and the power of attorney does not require Jaroslawicz to indemnify Steinberg's wife. (*Id.*)

2. Analysis

Steinberg is seeking indemnification for costs incurred in connection with litigation against Jaroslawicz, among others. Among other things, Jaroslawicz and the other plaintiffs initiated the involuntary bankruptcy proceeding against Steinberg and are pursuing this denial of discharge action against Steinberg, for which Steinberg incurred costs defending. The power of attorney did not expressly provide for indemnification in the case of litigation between Steinberg and Jaroslawicz. Additionally, there are no surrounding facts and circumstances that indicate this intent. Accordingly, Steinberg is not entitled to indemnification under the May 2008 power of attorney agreement. This claim fails and is dismissed with prejudice.

[*REMAINDER OF PAGE INTENTIONALLY BLANK*]

### III.    <u>**CONCLUSION**</u>

The Court concludes that judgment should be entered in favor of Steinberg dismissing the

Complaint with prejudice.  Additionally, judgment should be entered in favor of Jaroslawicz

dismissing Steinberg's Counterclaim with prejudice.  Steinberg's counsel shall prepare the

judgment consistent with this Opinion.

**IT IS SO ORDERED.**

Dated:    May 5, 2016
              New York, New York

                            _____*Martin Glenn*_____
                              MARTIN GLENN
                          United States Bankruptcy Judge