**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ────────────────────────────X | **NOT FOR PUBLICATION** |
| In re: | |
|      SAMUEL STEINBERG | Chapter 7 |
|      a/k/a SAM STEINBERG, | Case No. 14-10845 (MG) |
| | |
|          Debtor. | |
| ────────────────────────────X | |
| DAVID JAROSLAWICZ, DAVID WALKER, | |
| HOWARD FREUND, NEIL HERSKOWITZ, PHIL | |
| LIFSCHITZ, and ABRAHAM ELIAS, | |
| | |
|          Plaintiffs, | Adv. Proc. No. 14-02426 (MG) |
| | |
|      -against- | |
| | |
| SAMUEL STEINBERG a/k/a SAM STEINBERG, | |
| | |
|          Defendant. | |
| ────────────────────────────X | |

**MEMORANDUM OPINION AND ORDER FOLLOWING REMAND FROM**
**THE DISTRICT COURT ON PLAINTIFFS' OBJECTION TO THE**
**DISCHARGE OF THE ALLEGED DEBTS OWED BY DEFENDANT SAMUEL**
**STEINBERG AND STEINBERG'S COUNTERCLAIM FOR INDEMNIFICTION**

*A P P E A R A N C E S :*

RUBIN LLC
*Attorneys for the Plaintiffs*
345 Seventh Avenue, 21st Floor
New York, New York 10001
By:    Paul A. Rubin, Esq.


WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP
*Attorneys for Defendant Samuel Steinberg*
1201 RXR Plaza
Uniondale, New York 11556
By:    Richard F. Harrison, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is back before this Court on remand from the District Court,

which affirmed in part and vacated and remanded in part this Court's earlier decision and

judgment following trial. *In re Steinberg*, 2017 WL 1184314 (S.D.N.Y. Mar. 29, 2017)

(hereinafter, the "District Court Opinion"). In the earlier decision and judgment, this Court

entered judgment in favor of Samuel Steinberg ("Steinberg"), dismissing with prejudice

plaintiffs' complaint (the "Complaint," ECF Doc. # 1) seeking to deny Steinberg a discharge of

his alleged debts to the plaintiffs. *In re Steinberg*, 2016 WL 2637959, at *1 (Bankr. S.D.N.Y.

May 5, 2016) (hereinafter, the "Bankruptcy Court Opinion" together with the District Court

Opinion, the "Prior Opinions"). With respect to Steinberg's counterclaim seeking

indemnification for his legal fees from plaintiff David Jaroslawicz ("Jaroslawicz") for defending

the action, the Court entered judgment against Steinberg, dismissing the counterclaim with

prejudice. *See id.* Familiarity with the Prior Opinions is assumed. Those decisions will be

discussed only to the extent necessary to resolve the issues on remand from the District Court.

Plaintiffs Jaroslawicz, David Walker ("Walker") and Howard Freund ("Freund") first

filed an involuntary chapter 7 case against Steinberg on March 28, 2014, and then, on December

3, 2014, filed an adversary proceeding objecting to a discharge for (1) debts obtained by "false

pretenses, a false representation, or actual fraud," under section 523(a)(2)(A) of the Bankruptcy

Code, and (2) debts acquired through "embezzlement," under section 523(a)(4) of the Code. 11

U.S.C. §§ 523(a)(2)(A), (a)(4). In addition, plaintiffs objected to Steinberg's general discharge

on the grounds that he failed to preserve records, under section 727(a)(3) of the Code. This

Court rejected all of the plaintiffs' claims seeking to deny Steinberg a discharge. The District

Court affirmed this Court's prior decision in favor of Steinberg with respect to sections

523(a)(2)(A) and 523(a)(4), but vacated and remanded for additional findings with respect to this Court's decision in favor of Steinberg with respect to section 727(a)(3).

Following remand, I entered an Order requiring the parties to file briefs addressing the following issues of fact and law remanded by the District Court: (1) in connection with the claim seeking to deny Steinberg a discharge under section 727(a)(3) of the Code, whether Steinberg had maintained adequate records as to business transactions for a reasonable period of time before the bankruptcy proceeding was commenced, and if the Court finds that Steinberg failed to keep sufficient records, whether this failure was justified under the circumstances; and (2) whether Steinberg is entitled to indemnification for his legal fees in defending the action under common law principles of agency law, requiring the Court to make findings regarding the scope of the principal/agency relationship between Jaroslawicz and Steinberg, and the third-party investors and Steinberg. The parties filed their briefs on May 12, 2017. (ECF Doc. ## 148, 149, 150.) The record from the trial forms the factual predicate for the decision by this Court for the issues on remand. The Bankruptcy Court Opinion made extensive findings of fact and nothing in the District Court Opinion alters or rejects those findings of fact. Based on the trial record, and the Court's assessment of the credibility of the witnesses, the Court makes the additional findings of fact discussed below.

As explained in the Bankruptcy Court Opinion, this case arises from a failed multi-million dollar business venture that lacked the simplest corporate formalities and was virtually undocumented. In 2006, Jaroslawicz and Steinberg entered into a verbal agreement to acquire real estate in Romania at a time when the market was prospering, shortly before Romania acceded to the European Union on January 1, 2007.[1] Jaroslawicz and Steinberg were hugely

---

[1] In 2006, Steinberg formed three limited liability companies under Romanian law, which are referred to as the Romusa LLCs.

successful with the first property they purchased, more than doubling their money by flipping the property in 5 months.  This success whetted their appetites, leading them to purchase other properties for increasingly large sums, mostly raised from Jaroslawicz's wealthy friends or acquaintances.  Jaroslawicz solicited investments from individuals, including Howard Freund, Neil Herkowitz, and Phil Lifschitz (collectively and together with Jaroslawicz, the "Investor Plaintiffs").  There are no written agreements between Steinberg, Jaroslawicz and the Investor Plaintiffs.  The business venture failed after the worldwide real estate market collapsed during the Great Recession.  In June 2013, Steinberg commenced Romanian insolvency proceedings for the business venture.  Liliana Andreea Ciurea was appointed as the Romanian judicial administrator in those proceedings.  As already stated, the involuntary chapter 7 case against Steinberg was filed on March 28, 2014, followed by this denial of discharge adversary proceeding on December 3, 2014.

The Investor Plaintiffs objected to the discharge of the alleged debts of $16,754,000 they claim Steinberg owed to them.  They argued that Steinberg allegedly defrauded the Investor Plaintiffs, embezzled the money that they had entrusted to him to invest in the real estate venture in Romania (the "Romanian Real Estate Venture") and failed to account for the funds Steinberg received from them.  Additionally, the Investor Plaintiffs and two additional plaintiffs, David Walker and Abraham Elias (who loaned money directly to Steinberg, and obtained state court judgments for the unpaid debts), objected to Steinberg's general discharge on the grounds that Steinberg allegedly failed to preserve records, transferred assets within one year of commencing the underlying bankruptcy case, and made false oaths and material omissions in connection with the underlying bankruptcy case.  (Walker and Elias, together with the Investor Plaintiffs, hereinafter the "Plaintiffs.")

This Court held a trial in this adversary proceeding from December 7–10, 2015, with

4

closing arguments on February 5, 2016.  The Bankruptcy Court Opinion contains findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Court's findings of fact considered the credibility of the witnesses based on the Court's observation of their live testimony and the rest of the evidence introduced at trial.

In the Bankruptcy Court Opinion, the Court concluded that judgment should be entered in Steinberg's favor, dismissing the Complaint with prejudice.  With respect to Steinberg's counterclaim seeking indemnification of Steinberg's fees in defending the denial of discharge adversary proceeding, the Court concluded that judgment should be entered against Steinberg, dismissing the counterclaim with prejudice.

The District Court vacated and remanded a portion of the judgment for further proceedings—specifically, this Court's earlier findings and conclusion rejecting the Plaintiffs' arguments that Steinberg should be denied a discharge "under 11 U.S.C. § 727(a)(3) based on his allegedly deficient recordkeeping."  District Court Opinion at *7.

The District Court also vacated and remanded the judgment dismissing Steinberg's counterclaim for indemnification to the extent that the Bankruptcy Court Opinion failed to address whether Jaroslawicz is required to indemnify Steinberg under common law principles of agency.  District Court Opinion at *10–11.

## I.    PLAINTIFFS' CLAIM TO DENY DISCHARGE UNDER SECTION 727(a)(3) MUST BE DISMISSED

Section 727(a)(3) provides, in relevant part, as follows:

> The court shall grant the debtor a discharge, unless . . . the debtor
> has concealed, destroyed, mutilated, falsified, or failed to keep or

preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  The District Court explained its reasons for vacating the Bankruptcy

Court's earlier decision rejecting Plaintiffs' arguments under section 727(a)(3) as follows:

"To implement this record-keeping requirement, § 727(a)(3) provides a two-step approach."  *In re Cacioli*, 463 F.3d 229, 235 (2d Cir. 2006).  "The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained."  *Id.*; *accord* [*In re Kran*, 760 F.3d 206, 210 (2d Cir. 2014).]  At this step, the creditor must show that the debtor "failed to keep records such that his financial condition or business transactions could not be ascertained during the pendency of the [bankruptcy] proceeding or for a reasonable time before."  *In re Kran*, 760 F.3d at 210.  "If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified"— i.e., step two.  *In re Cacioli*, 463 F.3d at 235.

The Bankruptcy Court dismissed [Plaintiffs'] claim at step one; it held that [Plaintiffs] had not shown that Steinberg's documentation was "insufficient to accurately access his financial condition."  The court noted that Steinberg had provided eight years of joint tax returns, domestic banking statements with his wife, credit card statements and "bank account statements from Marfin Bank of Romania on the accounts of each of [the Romusa LLCs]."  The court rejected [Plaintiffs'] contention that the records were inadequate in light of "missing" documents related to the real estate venture, including the accounting files for the Romusa LLCs that Steinberg had turned over to a Romanian judicial administrator.  The Bankruptcy Court found that [Plaintffs] had not shown how these documents relate to Steinberg's financial condition.  The Bankruptcy Court's analysis, which assessed only whether Steinberg's financial condition could be ascertained from the documentation, is incomplete.  "Under section 727(a)(3), it is not sufficient that merely the debtor's financial condition be ascertainable from the debtor's books or records; they must also disclose material 'business transactions.'"  6 COLLIER ON BANKRUPTCY ¶ 727.03[3][f].  "Although [Section] 727(a)(3) focuses on records relating to the debtor's personal financial

6

affairs, his failure to keep adequate financial records regarding the business transactions of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge." *In re Gormally*, 550 B.R. 27, 49 (Bankr. S.D.N.Y. 2016) (quoting *In re White*, No. 12-11847, 2015 WL 9274771, at *3 (Bankr. S.D.N.Y. Dec. 18, 2015)); *see Office of the Comptroller Gen. of Republic of Bol. ex rel. Gen. Command of the Bolivian Air Force v. Tractman*, 107 B.R. 24, 27 (S.D.N.Y. 1989) ("[S]ection 727(a)(3)'s complete disclosure requirement extends beyond the property of the estate to include all 'business transactions' which shed light on the financial condition of the debtor."). The Bankruptcy Court did not address whether Steinberg had maintained adequate records as to business transactions for a reasonable period of time before the bankruptcy proceeding was commenced. The Bankruptcy Court should address this issue in the first instance, resolving any factual disputes. *See Klein v. Morris Plan Indus. Bank of N.Y.*, 132 F.2d 809, 811 (2d Cir. 1942) (noting that the provision that discharge may be denied if debtor has failed to keep records from which his financial condition and business transactions might be ascertained "intends an extensive discretion in the trier of facts").

District Court Opinion at *8 (internal footnote omitted).

The District Court also added in a footnote that

> Only if the Bankruptcy Court finds on remand that [Plaintiffs] have satisfied their burden to show that Steinberg failed to keep sufficient records does it need to address whether this failure was justified under the circumstances—i.e., step two of § 727(a)(3). *In re Cacioli*, 463 F.3d at 235. "[W]hether a debtor's failure to keep books is justified is a question in each instance of reasonableness in the particular circumstances." *Id.* (internal quotation marks omitted). This Court expresses no opinion on this issue.

District Court Opinion at *8, n.6. The foregoing analysis and conclusions by the District Court establishes this Court's task on remand, with respect to the section 727(a)(3) claim, to which I now turn.

This Court's prior opinion also discussed the legal standards for evaluating a section 727(a)(3) claim. The Court explained:

> To plead and prove a failure to keep or preserve books or records under this section, the movant must show (1) that the debtor has

failed to keep or preserve books or records; and (2) that the debtor's financial condition or business transactions might have been ascertained from those books or records.  If these two elements are satisfied, the debtor may respond by showing that the act or failure to act is justified by the circumstances of the case.  While a debtor has a duty to keep or preserve books and records sufficient . . . "to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs," *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 355 (4th Cir. 2007), there are instances where a debtor has no duty to preserve books.  For instance, a consumer debtor may not have an obligation to keep books, but a debtor who is a sophisticated business person "will be held to a higher level of accountability in record keeping."  6 COLLIER ON BANKRUPTCY ¶ 727.03[3][b] (citing *Meridian Bank v. Alten*, 958 F.2d 1226, (3d Cir. 1992)).  "If the nature and extent of the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, the debtor must show that because of unusual circumstances there was no duty to keep them." *Id.* (citing *In re Sandow*, 151 F.2d 807 (2d Cir. 1945)).  If a debtor has a duty to preserve his books and records, he must preserve all records that would be material to a proper understanding of his financial condition.  This includes "books of a partnership or corporation, . . . bank books, check[s], check stubs or other business papers" if they are "necessary to proper[ly] understand[] the debtor's financial condition and business transactions." *Id.* (citing *In re Esposito*, 44 B.R. 817 (Bankr. S.D.N.Y. 1984); *Tucker v. Devine (In re Devine)*, 11 B.R. 487 (Bankr. D. Mass. 1981)).  Under section 727(a)(3), after the objecting party has established its prima facie case by showing the records are insufficient "to ascertain the debtor's financial condition and business transactions, then the burden of coming forward shifts to the debtor to produce additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records." *In re Nemes*, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005) (internal citations and quotations omitted).

Bankruptcy Court Opinion at *17.  The Plaintiffs argued at trial, on appeal, and now on remand that Steinberg obstructed their ability to fully assess Steinberg's financial condition because Steinberg does not have access to the business records for the Romanian Real Estate Venture.  As explained below, the Court rejects the Plaintiffs' arguments and finds that, as Steinberg testified at trial (and the Court credits the veracity of Steinberg's testimony), Steinberg turned

over the original "accounting files" for the Romanian Real Estate Venture to the Romanian

judicial administrator in 2013 when he filed the insolvency proceedings on behalf of the Romusa

LLCs. *Id.* at *18. The Plaintiffs argue that Steinberg's failure to maintain copies of the business

records for the Romanian Real Estate Venture warrant a denial of discharge because Steinberg

has obstructed the Plaintiffs' ability to fully assess his financial condition. Plaintiffs

conveniently ignore in making their arguments the very substantial volume of probative evidence

that Steinberg provided to Plaintiffs during the bankruptcy case and in this adversary proceeding.

The records relate not only to Steinberg's financial condition at the time that the involuntary

chapter 7 case was filed, but more importantly for present purposes, for the period in which the

Romanian Real Estate Venture at issue took place and leading up to the filing of the Romanian

insolvency proceedings.

Throughout this adversary proceeding—in pleadings and then in his trial testimony—

Jaroslawicz has complained about Steinberg at every turn, but as recounted in the earlier opinion

of this Court, Jaroslawicz demonstrated substantial credibility issues. His repeated general

complaints that Steinberg failed to provide financial records detailing receipts and expenditures

concerning the Romanian Real Estate Venture ignore the substantial financial information that

Steinberg, in fact, provided to Jaroslawicz.

As this Court stated in its earlier opinion, Steinberg produced eight years of joint tax

returns, bank account statements, and credit card statements. Bankruptcy Court Opinion at *18.

*In addition*, Steinberg also provided the Plaintiffs with the following documents:

- domestic banking statements with his wife from HSBC Bank from 2006–2013;
- contact information of his former counsel who conducted the closing the sale of Steinberg's residence in July 2005;
- credit card statements from 2006–2013;
- loan history summaries, promissory notes, creditor pledge agreements and facsimiles of a certificate of deposit held by HSBC bank of Steinberg's former

9

company "SSII," whose credit line Steinberg used to fund approximately
$2,000,000 of investments made to the Romanian limited liability companies from
2006–2007; and

• bank account statements from Marfin Bank of Romania on the accounts of each
of the Romanian limited liability companies, from 2006–2011

Defendant's Findings of Fact and Conclusions of Law at ¶ 47 (ECF Doc. # 65).

The Joint Pretrial Order, signed by both counsel on November 20, 2015, included the

following stipulation:

> In response to Plaintiffs' notice for a 2004 examination, the
> Defendant served on or about September 16, 2014, *business
> records* bates stamped nos. 1-1494 and e-mails bates stamped nos.
> E-1-4112

(Joint Pretrial Order at 2, ¶ 5 ("PTO," ECF Doc. # 98) (emphasis added).)

The Plaintiffs also listed as trial exhibits in the Joint Pretrial Order *but never introduced

into evidence* the following financial records provided by Steinberg to Jaroslawicz:

| Exhibit No. | Description of Exhibit |
|---|---|
| PX-121 | Apostilles executed in connection with the Romanian LLCs |
| PX-122 | Bank records for Samuel Steinberg |
| PX-123 | Banks statements for Romusa Real Estate Holding SRL |
| PX-124 | Bank statements for Romusa Investments SRL |
| PX-125 | Bank statements for Romusa |
| PX-126 | Statements regarding Romusa Holding SRL |
| PX-127 | Statements regarding Romusa Investments and Romusa Land Investments |
| PX-128 | Statements regarding Romusa Real Estate Holdings |

*Id.* at 38. As this Court found at trial, Steinberg's personal accounts at Marfin Bank were set up

on the advice of bank representatives to facilitate transfers into the Romusa LLCs' accounts at

the same bank; and Jaroslawicz consented to the arrangements and knowingly transferred all

monies to Steinberg's Marfin accounts and the bank's statements on those accounts show such monies being transferred into the Romusa LLCs' accounts. (Bankruptcy Court Opinion at *18 (citing PTO at 18).) During the trial, Plaintiffs failed to examine Steinberg on a single bank statement on the Romusa LLCs, or on any specific transaction depicted in the LLC's bank records.

The PTO contains Plaintiffs' stipulations as to the authenticity and introduction of various business records and exhibits. (PTO at 44, § VIII(A).) Plaintiffs stipulated to the admissibility of Exhibit PX-120, "Powers of Attorney" executed by Jaroslawicz dated March 16, 2007, April 24, 2007 and May 16, 2008; PX-121, "Apostilles" executed in connection with the Romanian limited liability companies; PX-122, bank records for Samuel Steinberg; PX-127, statements regarding the Romusa investments and Romusa land investments; PX-128, statements regarding Romusa Real Estate Holdings. (*Id.*)

Plaintiffs also stipulated to the introduction of the Romusa 43-page land transaction chart prepared by Steinberg—it identifies each transaction, the sources of funds for purchase, the itemized costs in each transaction, and the properties to which such funding was expended. (*See* Trial Exhibit DX-B, the "Romusa Land Transactions Chart"; PTO at 44, § 8(a).)

The Romusa Land Transactions Chart presented: (i) a summary of the twelve aggregate plots acquired during the venture, their size, purchase price and total additional costs (Romusa Land Transactions Chart at 1458); (ii) a 32-page itemization of each individual parcel purchased, the costs for each parcel, and the source and amount of funding for each purchase (*id.* at 1458-1491); and (iii) a three page chart showing the funding contributed under Jaroslawicz's name and the funding attributed to Steinberg. (*Id.* at 1492-1494.) The chart listed the bank interest charged on each of the three mortgages utilized by the Romanian LLCs, and set forth the interest

paid per month on each loan.  (*See, e.g., id.* at 1474.)  The chart identified architectural fees,

notary fees, commissions paid per property, as well as other costs.  The chart further revealed

that the last funds provided under Jaroslawicz's name were credited on June 5, 2008, nearly six

years before the involuntary chapter 7 petition was filed in March 2014.  (*Id.* at 1492.)  The chart

shows that the last funds into the venture came from a $650,000 loan to Steinberg from his

father-in-law, Israel Taub, made on December 5, 2008.  (*Id.* at 1494.)

   Steinberg also provided substantial trial testimony about his business records and the

financial transactions he engaged in on behalf of the Romusa entities.  He testified about the land

transaction chart, and the nature and volume of business records provided to Jaroslawicz

throughout the venture.  Steinberg also testified that every time there was a transaction,

Jaroslawicz was provided with "contemporaneous records" of the transaction, consisting of sale

or purchase agreements and mortgages.  (Trial Tr. at 41:8-13 (Dec. 7, 2015).)  Steinberg testified

and introduced into evidence the first accounting provided to Jaroslawicz in December 2006,

depicting the parties' respective capital accounts.  (*See* Ex. DX-D, Ex. DX-G, Ex. DX-H.)

Steinberg testified that land reports were created during the course of the venture, detailing every

expenditure for all the lands purchased by the LLCs.  (Trial Tr. at 42:5-9 (Dec. 7, 2015).)

Steinberg testified that Jaroslawicz got "CDs" on monthly accountings prepared on the

Romanian limited liability companies by Romanian accountants.  (*Id.* at 42:10-16.)  Steinberg

testified that land reports were updated throughout the venture and at least through 2010, by

which time all land transactions had been completed.  (*Id.* at 43:16-18; *see also* Ex. DX-LL, (e-

mail from Steinberg to Jaroslawicz, January 7, 2009, "list of properties we own . . . spreadsheet

includes actual land cost and existing mortgages").)  Steinberg confirmed that Jaroslawicz

provided money deposited in Steinberg's personal accounts in Egnatia Bank and Marfin Bank,

and Steinberg reviewed those account records in preparing the final land transaction reports he

gave to Jaroslawicz. (Trial Tr. at 49:14-20 (Dec. 7, 2015).) Steinberg testified that in March

2009, he discussed the land reports on a visit to New York in Jaroslawicz's office. (*Id*. at 62:1-

9.) Jaroslawicz admitted he received land contracts from Steinberg. (Trial Tr. at 72:12-25 (Dec.

9, 2015).) Steinberg testified that the land reports were ongoing reports of all the land assets and

all of their related expenses, and that from 2009 through 2012, the reports were updated and

provided to Jaroslawicz on at least three to four occasions. (Trial Tr. at 62:23-25; 63:3-4 (Dec.

7, 2015).) Steinberg testified:

> Throughout the transactional period of the venture, I gave Mr.
> Jaroslawicz all the pertinent documents. When I say "pertinent
> documents", copies of all the land contracts, copies of all sale
> contracts, anything we bought, copies of all the mortgages, copies
> of all the evaluations, copies of all the bank statements. So yes,
> Mr. Jaroslawicz had all of the pertinent documents of this business
> throughout the period of time, and any time he asked . . . ."

(*Id.* at 64:13-22.) Steinberg's testimony emphasized the detail of the land reports,

> The land reports were details reports that itemized for each
> asset purchases and for each relevant company that owned the
> asset a list of all the figures that were relevant to the purchase and
> maintenance of that property.
>
> . . .
>
> To give you an example—and this is where my bookkeeper and
> my office manager extrapolated all the figures from purchases of
> the property. They were done sometimes over a period of a
> year. These were assemblage parcels, so it contains the dates and
> the amounts of all transactional figures that were relevant to the
> purchase of the property. It contains all the land taxes that were
> paid to the property. It contains any commissions that were
> paid for those properties. It contains all the bank interest if there
> were relevant mortgages on those properties. It contains all the
> notary expenses—because notaries in Romania get a fee, and it's
> different than the one here—for all transactions. And anything
> that was relevant to the expenses of those lands and assets were
> contained in detailed reports of each land that was acquired by the

> [Romanian] companies.  It did not contain office expenses,
> miscellaneous expenses, or my expenses, for that matter, which
> I've never recouped.  But it does show where all the money
> came in and where all the money went.

(*Id.* at 65:21-25; 66:1-19.)  In cross-examination, Steinberg tied together the

business records given to Jaroslawicz throughout the venture:

> If I remember correctly, about 28,000,000€ plus were spent on
> these acquisitions, of which 9,500,000€ approximately, were
> from the Egnatia and Marfin Bank mortgages.  Those mortgages
> obviously are receipts.  The rest of it . . . the bulk of it were . . . I
> mean of the bulk of the expenses of the 28,000,000€ or
> 29,000,000€ worth of expenses were 20,000,000€ to 25,000,000€
> worth of land purchases so let's try that again.  The rest of it . . .
> the bulk of it . . . I mean the bulk of the expenses, of the
> 28,000,000€ or 29,000,000€ worth of expenses were 25,000,000€
> to 20,000,000€ worth of land purchases.  If you are asking for a
> receipt, he had copies of that. It's call land contracts.  They define
> the amount of money.  He can check it against the bank statements
> where it came from, and it defines exactly how much money was
> spent in Romania.  And if you're asking about the 3,000,000€
> extra expenses, what I call miscellaneous land expenses, well,
> 2,000,000€ or so came from the bank interest and mortgages.
> Does he have receipt of those?  Well, he didn't get the money for
> free.  Yes, he has the mortgages; it tells you the terms.  He can
> probably add them up.  And did I add them up, every expense—
> interest expense.  Were there notary expenses?  The receipts are
> in the land contracts.  Notaries get them from land contracts.  So
> I would say 95% or 96% or 97% of all the monies spent in the
> Romanian venture he has receipts for.  So the answer is, almost
> all of it he has receipts for.

(Trial Tr. at 69:11-25; 70:1-19 (Dec. 7, 2015).)  The Romusa Land Transactions Chart covered

the twelve major plots and each of the hectares purchased to build a plot.  (Romusa Land

Transactions Chart at 1458–80.)  In some transactions, a single plot could consist of seventeen

separate hectares acquired over a period of fifteen months.  (*Id.* at 1462 ("Cluj Land 17 HA").)

Jaroslawicz never introduced into evidence at trial *any* land contract, although he had copies of

them.  Notary fees were based on each land contract and comprised a significant portion of the

"additional land costs" reflected in the land chart.  (*Id.* at 1458, 1462; *see also* Trial Tr. at 69-11:25 (Dec. 7, 2015).)  Jaroslawicz never rebutted the notary fees.  The chart also showed that over 1,600,000€in mortgage interest was paid, comprising a further component of the "additional land costs."  (*See* Romusa Land Transactions Chart at 1463, 1468, 1474 ("Loan Interest" on four facilities adding up to almost 1,635,000€).)  Jaroslawicz approved each of the mortgages, and he signed numerous documents for each mortgage.  *See* Bankruptcy Court Opinion at *8.  Plaintiffs' argument that "Defendant provided no documentation of the 'additional land costs'" (PTO ¶ 40) is contrary to the evidence introduced at trial.

Applying the legal standards set forth in the District Court Opinion, the Court concludes that the Plaintiffs failed to carry their initial burden of showing that Steinberg failed to keep and preserve books or records from which Steinberg's financial condition or business transactions might be ascertained.  Furthermore, the Plaintiffs did not carry their burden of showing that Steinberg failed to keep records such that his financial condition or business transactions could not be ascertained during the pendency of the bankruptcy case or this adversary proceeding, or for a reasonable time before.  Thus, the Court concludes that the burden did not shift to Steinberg to prove that his failure to produce records was "justified."  Steinberg testified that he turned over the original accounting records for the Romanian Real Estate Venture to the judicial administrator in the Romanian insolvency proceedings—and, therefore, could not produce those precise records to the Plaintiffs.  (Trial Tr. at 65:12-20; 159:3-160:12 (Dec. 7, 2015).)  The Court finds that the records that he did produce to the Plaintiffs were sufficient to permit them to ascertain Steinberg's financial condition when the involuntary bankruptcy case was filed, and for a reasonable time beforehand.  More importantly, the Court finds that Steinberg maintained and produced financial records to Plaintiffs that included Steinberg's "business transactions,"

specifically for the Romusa entities, "which shed light on the financial condition of the debtor." District Court Opinion at *8 (citation omitted).

The Court further finds that even if Steinberg failed to keep adequate financial records regarding the business transactions of the Romanian Real Estate Venture, his explanation that he provided the original records to the Romanian judicial administrator provided sufficient justification for being unable to produce copies of those records to the Plaintiffs. But again, the records that Steinberg did produce were sufficient to ascertain his financial condition, evaluate the Romanian business transactions, and ascertain the inflow and outflow of funds.

For the foregoing reasons, the Court concludes that the Plaintiffs have failed to carry their burden to establish that Steinberg should be denied a discharge under section 727(a)(3).

## II.    STEINBERG'S COUNTERCLAIM FOR COMMON LAW INDEMNIFICATION MUST BE DISMISSED

With respect to Steinberg's counterclaim for indemnification, the District Court ruled as follows:

> Steinberg asserts a counterclaim seeking indemnification for his attorney's fees in this adversary proceeding from Jaroslawicz based on the May 2008 power of attorney *or common law agency principles*. The Bankruptcy Court dismissed the claim, holding that the power of attorney did not expressly provide for such indemnification. The court did not address whether common law agency principles provide for indemnification. As explained below, the Bankruptcy Court's dismissal of the counterclaim is affirmed in part, vacated in part and remanded for further proceedings.

District Court Opinion at *9 (emphasis added). The Court finds the District Court's ruling surprising in that the *only* issue Steinberg identified in the Joint Pretrial Order concerning indemnification related to the powers of attorney that Jaroslawicz signed in favor of Steinberg in connection with the real property transactions. This Court rejected Steinberg's

16

argument that the powers of attorney gave rise to a right to indemnification for the defense

costs of the denial of discharge adversary proceeding.  The District Court affirmed that

ruling.  *See* District Court Opinion at *9 (noting that "[t]he Bankruptcy Court dismissed the

claim, holding that the power of attorney did not expressly provide for such

indemnification").

The Joint Pretrial Order includes the parties' contentions, and states at the outset that

"[t]he pleadings are deemed amended to embrace the following, and only the following,

contentions of the parties."  (PTO at 4.)  With respect to the counterclaim, Steinberg contended

as follows:

> Defendant's Counterclaim for indemnification alleges: (1) that in
> the course of the multiple loans secured by the Romusa LLCs
> under Jaroslawicz's consent, Jaroslawicz, executed powers of
> attorney to the Defendant; (2) that Jaroslawicz's power of attorney
> of May 2, 2008, conveyed authority to Mr. Steinberg to, inter alia,
> "decide freely upon the terms and conditions of said operations . .
> ."; (3) that Mr. Steinberg was "guaranteed" (4) that he would be
> "exonerated of any liability for any losses and damages arising
> from or in connection with the present power of attorney"; and (5)
> that Mr. Steinberg's May 2008 power of attorney was never
> revoked.

(PTO at 24.)  The Joint Pretrial Order further explained the issues to be tried and the parties'

contentions, as follows:

> G.  Counterclaim for Indemnification Against the Plaintiff,
> Jaroslawicz
>
> Has Defendant proved, by a preponderance of the evidence, the
> following elements?
>
> Defendant's Version:
>
> 1. On May 19, 2008, the Plaintiff, Jaroslawicz, executed a power
> of attorney running to the Defendant, Mr. Steinberg (Defendant's
> Exhibit DX–C, sub(c), Bates Nos. 1018-1019).

2. The power of attorney stated in relevant part: "I hereby guaranty that my attorney will be exonerated of any liability for any losses and damages that may occur, arising from or in connection with fulfilling the present power of attorney."

3. In fulfillment of his duties as agent and attorney for Jaroslawicz in the Romusa Holding S.R.L., the Romusa Real Estate Holding S.R.L. and Romusa Investments S.R.L., Mr. Steinberg has now incurred losses and damages in connection with the May 19, 2008 guaranty of exoneration by Jaroslawicz, and that Jaroslawicz has defaulted in his obligations to exonerate Mr. Steinberg of his losses and damages.

Plaintiffs' Version:

1. That Plaintiff Jaroslawicz executed a power of attorney appointing Defendant on May 19, 2008;

2. That the Agreement stated in relevant part: "I hereby guaranty that my attorney will be exonerated of any liability for any losses and damages that may occur, arising from or in connection with fulfilling the present Power of Attorney";

3. That, based on the specific language of the May 19, 2008 power of attorney, a promise or intent to indemnify for Defendant's conduct now complained of can be clearly implied from the language and purpose of the entire May 19, 2008 power of attorney and the surrounding circumstances;

4. That Defendant has incurred losses and damages arising from or in connection with fulfilling the purpose of the May 19, 2008 power of attorney; and

5. That it is unmistakably clear from the language of the promise or clearly implied from the language and purpose of the entire agreement that the parties intended that the scope of any promise or agreement.

(PTO at 27-28.)

Steinberg's counterclaim and the PTO based the indemnification counterclaim *solely* on

the execution of powers of attorney.  (*See* Steinberg's Answer to Plaintiffs' Complaint ¶¶ 124-

125 ("Answer," ECF Doc. # 6); PTO§ I at 2, § V(G) at 27-28.  No mention was made of

indemnification based on agency principles in the Pretrial Memorandum of Law of Defendant,

Samuel Steinberg, filed on October 9, 2015 (ECF Doc. # 66)—it discusses only indemnification

based on the May 2008 power of attorney.  (*See id.* at 32–33.)  Steinberg's counsel raised the

agency theory for the first time in a legal memorandum submitted near the end of trial, but the

issue had not been raised or preserved in the Joint Pretrial Order.  (*See* Defendant Samuel

Steinberg's Bench Memorandum in Support of Defendant's Right to Legal Fees at 3–4 (ECF

Doc. # 95.)  Nevertheless, because the District Court believed that Steinberg is entitled now to

have this Court consider this claim for indemnification based on agency principles, the Court

will do so.

In their brief on remand, Plaintiffs correctly set forth the applicable legal principles for

indemnification.  Under the general rule in New York, attorneys' fees are the ordinary incidents

of litigation and may not be awarded to the prevailing party unless authorized by (i) agreement

between the parties, (ii) statute, or (iii) court rule.  *Oscar Gruss & Son, Inc. v. Hollander*, 337

F.3d 186, 199 (2d Cir. 2003); *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491

(1989).  An agent who is compelled to defend a lawsuit based on acts performed in his

principal's business may recover the expenses of his defense from his principal.  *See Admiral

Oriental Line v. U.S.*, 86 F.2d 201, 202 (2d Cir. 1936) (concluding that an agent may recover

expenditures necessarily incurred in the transaction of his principal's affairs) (citing *Bibb v.

Allen*, 149 U.S. 481 (1893)).  Judge Learned Hand explained in *Admiral Oriental Line* that this

doctrine stands upon the fact that the venture is the principal's, and that, as the profits will be his,

so should the expenses.  *See id.*

"When a party is under no legal duty to indemnify, a contract assuming that obligation

must be strictly construed to avoid reading into it a duty which the parties did not intend to be

assumed." *Hooper Assocs.*, 74 N.Y.2d at 491 (internal citations omitted).  Under New York law,

an agreement by a party to a contract to indemnify the other for attorney's fees incurred in

litigation between them must be "unmistakably clear from the language of the promise," or else

it must be manifest from the surrounding facts and circumstances or purpose of the agreement.

*Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999) (quoting *Hooper*

*Assocs.*, 74 N.Y.2d at 492) (internal citations omitted).

Steinberg's counterclaim alleges that he and Jaroslawicz "were co-equal members of the

three Romanian limited liability companies identified as Romusa Investments S.R.L., Romusa

Holding S.R.L. and Romusa Real Estate Holding, S.R.L."  (Answer ¶ 123.)  Steinberg's

counterclaim does not allege that Steinberg was an agent acting for Jaroslawicz as principal.

Moreover, in the earlier opinion, this Court found that Steinberg and Jaroslawicz were 50/50

partners.  *See* Bankruptcy Court Opinion at *2, *10, *13, and *14.  Thus, Steinberg was a

principal conducting business on his own behalf, not merely an agent conducting business on

behalf of his principal.  Steinberg was entitled to share in the profits, if any, because he was a

principal together with Jaroslawicz, and not merely an agent doing business for Jaroslawicz.

Jaroslawicz may have raised funds from the Investor Plaintiffs, who are also Plaintiffs seeking to

deny Steinberg a discharge, but Steinberg has no better claim for common law indemnity with

respect to the claims of the Investor Plaintiffs as their claims against Steinberg are based on

Steinberg's conduct, not Jaroslawicz's conduct.  Therefore, Steinberg has no common law right

to indemnification under principles of agency law.

Additionally, while Steinberg successfully defended the denial of discharge adversary

proceeding, he was sued based on his own conduct, not the conduct of Jaroslawicz.  While an

agent may obtain reimbursement from his principal for expenses incurred defending litigation

20

brought against him for conduct on behalf of his principal, the agent may not recover from a principal if the litigation sought to place personal liability on the agent for a personal breach of trust. *See Buckley v. City of New York*, 10 N.Y.S.2d 650, 653 (Sup. Ct. N.Y. Cty. 1939). Common law indemnification protects an agent who is held liable solely by operation of law because of his relation to the actual wrongdoer. *See McCarthy v. Turner Construction, Inc.*, 17 N.Y.3d 369, 375 (2011). A party sued solely for its own alleged wrongdoing, rather than on a theory of vicarious liability, cannot assert a claim for common law indemnification. *See O'Connor v. Lowe's Home Centers, Inc.*, 2015 WL 507515 at *6 (N.D.N.Y. Feb. 6, 2015); *Mathis v. Centr. Park Conservancy, Inc.*, 674 N.Y.S.2d 336, 337 (1998). The causes of action against Steinberg were based on Steinberg's own conduct. None of the claims seeks to hold Steinberg vicariously liable for Jaroslawicz's conduct. The Court expressly finds that Steinberg was not Jaroslawicz's agent; therefore, Steinberg has no common law right to indemnification.

### III.    CONCLUSION

The Court concludes that judgment should be entered in favor of Steinberg dismissing with prejudice the claim to deny a discharge under section 727(a)(3). Additionally, judgment should be entered in favor of Jaroslawicz dismissing with prejudice Steinberg's Counterclaim for common law indemnification. Steinberg's counsel shall prepare the judgment consistent with this Opinion.

**IT IS SO ORDERED.**

Dated:    June 1, 2017
          New York, New York

                                    *Martin Glenn*
                          _____
                              MARTIN GLENN
                         United States Bankruptcy Judge